OPINION BY
BOWES, J.:
¶ 1 Appellant, M.H., appeals from the order entered on July 5, 2006, which es-topped him from denying paternity of N.H. After careful review, and for reasons set forth below, we reverse.
¶ 2 Appellant and N.C. (“Wife”) were married on May 18, 1989. During the course of the parties’ marriage, N.H., the subject of this appeal, was born on December 31, 1992, and their second child, E.H., was born on October 12, 1995. Wife filed for divorce on February 24, 2000, and a divorce decree was entered on October 20, 2000. Unbeknownst to Appellant, Wife had been having an extramarital affair at the time N.H. was conceived; without reason to suspect that N.H. was not his, Appellant raised him as his own.
¶3 On May 19, 2005, Appellant filed a petition for special relief to dismiss a child support obligation based upon a comprehensive settlement agreement entered into on September 8, 2000, wherein Appellant acknowledged that he was the father of both children born during his marriage and agreed to pay child support for both children.[2] In his petition to dismiss, Appellant alleged that N.H. was not his biological child, sought termination of his support obligation, the return of all support money paid on N.H.’s behalf, the payment of attorney’s fees, and a finding that the final property settlement was void ab ini-tio.
¶ 4 A hearing was held before hearing officer Patricia Miller, wherein it was established that in the spring of 1992, Wife became pregnant. Both parties, now physicians, were participating in their residency programs and using two forms of birth control, condoms and the rhythm method. During the hearing, Wife reluctantly conceded that at the time of N.H.’s conception, she was having unprotected sexual relations with another physician, Dr. R.V. Notwithstanding her admission, Wife testified that she never had any reason to believe that anyone other than Appellant was the biological father of N.H. N.T., Support Hearing, 10/14/05, at 101-02. Appellant subpoenaed Dr. R.V. who testified that Wife was keenly aware that he had undergone surgical procedures to enhance his fertility in an attempt to have more children with his spouse.[3] Id. at 80.
¶ 5 Dr. R.V. also testified that when Wife informed him of her pregnancy in the spring of 1992, he told her he would not *502 leave his spouse and asked her whether she considered terminating the pregnancy. Id. at 80-81. After that discussion, the extramarital affair ended, and Wife informed Appellant that she was pregnant. Appellant questioned how Wife could become pregnant in light of their use of contraceptives, and Wife’s sole response was that their methods of birth control were not one-hundred percent effective. Id. at 98.
¶ 6 Despite her knowledge that she had been having unprotected sex with another man at the time of conception, Wife testified before the hearing officer that she continued to believe that Appellant was the father of N.H. On cross-examination, Appellant’s counsel questioned Wife’s belief by referencing the genetic testing results,[4] which proved otherwise, and stated, “I have to ask you, you said it’s always been your belief that [Appellant] is the father of [N.H.]. Then what did you believe when [Appellant] told you about the genetic testing?” Id. at 109-10. This question was not permitted by the hearing officer due to a motion in limine which excluded the genetic test results.
¶ 7 Hearing Officer Miller assessed the credibility of the witnesses, determined that Appellant was estopped from denying paternity of N.H., and concluded that Wife did not make misrepresentations to Appellant, fraudulent or otherwise, regarding paternity. See Trial Court Opinion, at 1-2. The trial court affirmed the hearing officer’s decision, and this timely appeal followed, wherein Appellant raised the following issues for review:
1. Did the trial court err by finding that the doctrine of paternity by es-toppel was applicable where there was no intact family and where the mother had fraudulently concealed from the putative father that she had been engaging in extramarital, unprotected sex with another man at the time of the child’s conception?[5]
2. Did the trial court err by refusing to permit [Appellant] to produce evidence via cross-examination of the mother regarding the results of private genetic testing where the mother raised the issue as a defense in direct testimony?
Appellant’s brief at 4.
¶8 In matters involving paternity, we must first determine if the presumption of paternity applies. In Brinkley v. King, 549 Pa. 241, 250, 701 A.2d 176, 180 (1997), the Supreme Court set forth the analysis required to determine the paternity of a child conceived or born during marriage:
The essential legal analysis in these cases is twofold: first, one considers whether the presumption of paternity applies to a particular case. If it does, one then considers whether the presumption has been rebutted. Second, if the presumption has been rebutted or is *503 inapplicable, one then questions whether estoppel applies. Estoppel may bar either a plaintiff from making the claim or a defendant from denying paternity. If the presumption has been rebutted or does not apply, and if the facts of the case include estoppel evidence, such evidence must be considered.
¶ 9 The policy underlying the presumption of paternity is the preservation of marriage, and the presumption only applies in cases where that policy would be advanced by the application. See Fish v. Behers, 559 Pa. 523, 741 A.2d 721, 723 (1999). Here, there is no intact family or marriage to preserve; hence, the presumption of paternity is not applicable.[6] Accordingly, we must determine whether the estoppel doctrine applies, which depends upon the particular facts of each case. Gebler v. Gatti, 895 A.2d 1 (Pa.Super.2006).
¶ 10 Under the doctrine of paternity by estoppel, an individual may be “es-topped from challenging paternity where that person has by his or her conduct accepted a given person as the father of the child.” Jones v. Trojak, 535 Pa. 95, 634 A.2d 201, 206 (1993). Such estoppel “is based on the public policy that children should be secure in knowing who their parents are,” Brinkley, supra at 180, and, as such, it is designed to protect the best interests of minor children. See Fish, supra at 724. As the Supreme Court has explained, “[I]f a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father.” Brinkley, supra.
¶ 11 As noted, Appellant, having no reason to believe otherwise, held N.H. out as his own from N.H.’s birth in 1992 until genetic testing excluded him as the father in 2004. After the testing, Appellant testified that Wife accelerated his separation from N.H. Here, Appellant argues that the doctrine of estoppel is inapplicable because Wife’s fraudulent conduct was the basis for his treating N.H. as his own.
¶ 12 “When allegations of fraud arise in a paternity action, an estoppel analysis must proceed in a different manner than it would without such averments.” McConnell v. Berkheimer, 781 A.2d 206, 211 (Pa.Super.2001). Evidence of fraud “must be considered by the trial court in whether to apply paternity by estoppel.” Doran v. Doran, 820 A.2d 1279, 1284 (Pa.Super.2003) (quoting Sekol v. Delsantro, 763 A.2d 405, 410 (Pa.Super.2000)). The test for fraud is: (1) misrepresentation, (2) a fraudulent utterance, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as a proximate result. Sekol, supra at 411 n. 7.
¶ 13 In the instant case, the trial court adopted the hearing officer’s specific findings that since Wife did not make repeated representations to Appellant in response to repeated questions about paternity, there was no fraud. It is upon that basis that the hearing officer erroneously distinguished Doran, supra, from the case at bar. After careful review, we are constrained to conclude that Doran, as discussed infra, is wholly applicable here, and *504 hence we reverse the order dismissing Appellant’s exceptions.
¶ 14 An appellate court will not disturb an order of the trial court unless there has been an abuse of discretion. See Doran, supra at 1282. Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Id. Consequently, the court abuses its discretion if, in resolving the issue for decision, there is insufficient evidence to sustain the order.
¶ 15 Based upon our scope of review, we hold that the evidence was insufficient to support the trial court’s order. Wife, a medical doctor, conceded that at the time of conception, she had sexual relations with both Appellant and Dr. R.V. Further, Wife admitted that she never told Appellant about her meretricious relationship. Appellant, believing that their two forms of contraceptives were reliable, asked Wife how she became pregnant. Although it is apparent from Dr. R.Y.’s testimony that Wife considered the possibility that he could have fathered her child, she failed to disclose to Appellant her sexual relationship with another man at the time of N.H.’s conception. Rather, the record reveals that Wife asserted to Appellant that the pregnancy could only have been caused by the failure of them birth control methods; correspondingly, her omission of materially relevant facts induced Appellant into acknowledging N.H. as his child.
¶ 16 Appellant operated for more than a decade under the false pretense that he was, indeed, N.H.’s father. It is undisputed that this subterfuge was a direct result of Wife’s misrepresentation by omission and intentional misstatements to Appellant. Furthermore, a review of the record infers that Appellant would not have held N.H. out as his own had it not been for Wife’s fraudulent conduct. We, therefore, find that Appellant made out a case of fraud and that the trial court abused its discretion. Appropriately, we hold that Appellant is not estopped from denying paternity of N.H. born during his marriage to Wife.
¶ 17 Our decision in this case is not novel; in fact, we addressed a nearly identical issue in our recent decision in Doran, supra at 1283-84, and concluded that we would not allow the application of estoppel to punish the party who sought to do what was righteous and reward the party who had perpetrated a fraud. In Doran, the appellant mother argued that either the presumption of paternity applied or the father was estopped to deny paternity because the child was born during the marriage, and the father held the child out as his own. Like Appellant here, the father was unaware that the mother had sexual relations with another man at the time of conception. Similarly, the father became suspicious, asked the mother whether he was the child’s father, and she assured him that the child was his. However, when the child was eleven, DNA testing established that the father was not the child’s biological father. This Court reasoned that although the father held the child out as his own from the child’s birth until learning the results of the DNA testing, he would not have done so had it not been for the mother’s fraudulent conduct. Thus, the father was not estopped from denying paternity, and we affirmed the dismissal of the child support order.
¶ 18 Moreover, most recently, in Gebler, supra at 5, we acknowledged that there is a “strong public policy against permitting a party who has acted in reliance upon a misrepresentation to suffer harm” and in that case, precluded the application of es-toppel. In Gebler, the father held the child out as his own for eighteen months under the mother’s misrepresentation that *505 he was the only one having sexual relations with her at the time of conception. Here, too, the doctrine of estoppel was held inapplicable as this Court concluded that the mother concealed that which should have been disclosed. See McConnell, supra; Sekol, supra; see also Moody v. Moody, 822 A.2d 39 (Pa.Super.2003) (where the appellant was misled at the time he signed the agreed order of support, this Court refused to apply paternity by estoppel). Upon review, we find the rationale of Doran and Gebler equally applicable to the present discussion and reverse the order of the court dismissing Appellant’s exceptions.
¶ 19 In light of our reversal, we need not address whether it was error for the hearing court to refuse evidence of genetic testing after Wife raised knowledge of paternity as a defense during her direct examination.
¶ 20 Accordingly, the doctrine of estop-pel is inapplicable and we reverse the order of the court entered on July 5, 2006, dismissing Appellant’s exceptions, and further, we direct the trial court to order the parties to undergo genetic testing.
¶21 Order reversed. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

. We note that no appeal was taken from the support order. Ordinarily, this would render the matter res judicata and determine paternity as a matter of law; however, for reasons stated infra, neither res judicata nor paternity by estoppel is applicable here. See Gebler v. Gatti, 895 A.2d 1, 2 n. 1 (Pa.Super.2006); see also Moody v. Moody, 822 A.2d 39 (Pa.Super.2003).

. Wife testified during direct examination that she thought Dr. R.V. was sterile; however, Dr. R.V. offered contrary testimony, and Wife admitted to knowledge of the surgical procedure on cross-examination. N.T., Support Hearing, 10/14/05, at 117,

. Appellant performed the genetic testing in the summer of 2004 after he had doubts about N.H.’s paternity. Appellant testified that he began to notice the dissimilarity of N.H.'s features, mannerisms, body habitus, and attitude to his own and others in his family. N.T., Support Hearing, 10/14/05, at 12-13. Appellant confronted Wife with the test results and they attempted unsuccessfully to settle the matter between them. Id. at 27-29. Appellant then Bled for special relief. Since learning of N.H.'s paternity, Appellant has attempted to disengage himself from the child's life, and Wife expedited his detachment by telling N.H. that Appellant had no interest in being his father. N.T., Support Hearing, 10/14/05, at 108-09.

. This question, as posited by Appellant, mistakenly suggests that the doctrine of paternity by estoppel also applies to intact marriages; however, the "intact marriage” analysis only has relevance to the presumption of paternity doctrine, as discussed infra.

. Wife argues that the presumption of paternity applies herein and cites Ruth F. v. Robert B., 456 Pa.Super. 398, 690 A.2d 1171 (1997); however, as noted above, our Supreme Court has affirmatively stated that the policy underlying the presumption of paternity is the preservation of marriage, and it is undisputed that there is no intact marriage here to sustain.