**Selena Y. GLOVER, Appellee**

**v.**

**Pericles A. SEVERINO, Sr., Appellant.**

Superior Court of Pennsylvania.

Submitted Oct. 1, 2007.

Filed March 27, 2008.

Lisa J.A. McCoy, Lancaster, for appellant.

Danielle Mosier, Lancaster, for appellee.

BEFORE: KLEIN, PANELLA and KELLY, JJ.

OPINION BY KELLY, J.:

¶ 1 Appellant, Pericles A. Severino, Sr., appeals from the order entered in the Lancaster County Court of Common Pleas de-nying his request to challenge paternity. Because we find that the trial court abused its discretion in concluding that the record did not establish fraud and in applying the doctrine of paternity by estoppel, we reverse.

¶ 2 The support case underlying this appeal began in July, 1995 when Appellee, Selena Y. Glover filed a complaint for support of P.J., her infant son. The parties met as students at Millersville University in 1994, and had a brief sexual relationship. Shortly after the relationship concluded, Appellee discovered she was pregnant. After the child was born on February 21, 1995, Appellant visited the hospital to see him, and signed the birth certificate as the father. In the months that followed, and while he remained a student at the university, Appellant visited the child sporadically. When the initial support complaint was filed in 1995, Appellant completed the related paperwork, which included an acknowledgement of paternity.

¶ 3 After he left school, Appellant's visits with the child were infrequent; he attended only a few birthday parties and on a few occasions brought the child gifts and clothes. In 1997 however, Appellant filed for partial custody of the child, resulting in an order allowing him visitation. At some point after the birth of the child, Appellee rekindled her relationship with and then married the man she had dated before she became involved with Appellant. They remained married until sometime in 2004; P.J. called Appellee's husband "Dad," and Appellee characterized him as the dad who was "there for [P.J.] every day." (N.T. Hearing, 4/20/07, at 19).

¶ 4 Although contact was minimal, Appellant regularly paid his court-ordered child support until 2006, when he had a private paternity test taken which exclud-

ed him as P.J.'s biological father. On October 25, 2006, the court entered its most recent in a long history of support modification orders, and Appellant demanded a hearing, raising the issue of paternity for the first time. A hearing was held on January 12, 2007, and the court ordered genetic testing, which confirmed the results of the private test, again excluding Appellant as P.J.'s biological father.

¶ 5 A hearing on the issue of paternity by estoppel was held on April 20, 2007, at which both Appellee and Appellant testified. The trial court entered an order on April 25th, finding that Appellant was estopped from denying paternity. This timely appeal followed.

¶ 6 Appellant presents two questions for our review, arguing that the trial court abused its discretion in determining that there was no fraud precluding paternity by estoppel, and that the facts of this case warranted the application of estoppel.

■ ¶ 7 With regard to fraud, Appellant argues that the only reason for the limited and sporadic contact he had with the child was Appellee's misrepresentations, noting that she "has and continues to assure [him] that he is the biological father despite the fact that the genetic tests conclusively prove that he is not the father." (Appellant's Brief at 11). He also argues that he demonstrated fraud on Appellee's part through his testimony regarding his questioning of paternity when initially informed of the pregnancy, that she told him her "tubes were tied," and that she had other sexual partners during the time period of the conception. Thus, he insists, this showing of fraud precludes application of the doctrine of paternity by estoppel.

¶ 8 Additionally, he argues that he has not held himself out as the child's father or provided paternal support such that he should be estopped from challenging his paternity. He asserts that there has never been a father-son relationship between himself and the child, and the minimal contact he had with P.J. does not warrant the application of estoppel to his paternity challenge. Because we find that there is fraud, and that the trial court misapplied the law of paternity by estoppel, we agree.

■ ¶ 9 Our standard of review in matters involving support is well established:

A reviewing court will not disturb an order of the trial court unless there has been an abuse of discretion. An abuse of discretion exists if the trial court has overridden or misapplied the law, or if there is insufficient evidence to sustain the order. Moreover, resolution of factual issues is for the trial court, and a reviewing court will not disturb the trial court's findings if they are supported by competent evidence. It is not enough that we, if sitting as a trial court, may have made a different finding.

*Doran v. Doran,* 820 A.2d 1279, 1282 (Pa.Super.2003) (internal citations and quotations omitted). "If a child is born out of wedlock, the presumption of paternity does not apply because there is no intact family to protect." *Gebler v. Gatti,* 895 A.2d 1, 3 (Pa.Super.2006). When there is no presumption, a putative father is entitled to a hearing on whether he should be estopped from denying paternity. *Id.*

¶ 10 In *Doran, supra,* we discussed the doctrine of paternity by estoppel:

[It] is merely the legal determination that because of a person's conduct (e.g., holding out the child as his own, or supporting the child) that person, regardless of his true biological status, will not be permitted to deny parentage, nor will the child's mother who has participated in this conduct be permitted to sue a third party for support, claiming that the third party is the true father

... [T]he doctrine ... is aimed at achieving fairness as between the parents by holding them, both mother and father, to their prior conduct regarding the paternity of the child.

*Doran, supra,* at 1283 (citing *Fish v. Behers,* 559 Pa. 523, 741 A.2d 721, 723 (1999)). However, in cases where fraud has been alleged, the analysis of whether estoppel should be applied "must proceed in a different manner than it would without such averments." *Id.* When an individual acknowledges paternity only as a result of fraud and outside the context of an intact family, the application of estoppel does not serve the underlying policy interests. As this Court has explained:

> [T]he doctrine of paternity by estoppel grew out of a concern for the protection of the family unit; where that unit no longer exists, it defies both logic and fairness to apply equitable principles to perpetuate a pretense. In [such] case[s], application of estoppel would punish the party that sought to do what was righteous and reward the party that has perpetrated the fraud.

*Id.* Thus, evidence of fraud must be considered by the trial court in order to determine if estoppel should apply. *Id.*

¶ 11 The traditional test for fraud is: (1) a misrepresentation; (2) a fraudulent utterance; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient as a proximate result. *N.C. v. M.H.,* 923 A.2d 499, 503 (Pa.Super.2007). A misrepresentation need not be an actual statement; it can be manifest in the form of silence or failure to disclose relevant information when good faith requires disclosure. *In re Adoption of R.J.S.,* 889 A.2d 92, 98 (Pa.Super.2005) ("Fraud is practiced when deception of another to his damage is brought about by a misrepresentation of fact **or by silence when good faith required expression.**" (emphasis in original)). "Fraud comprises anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether by direct falsehood or innuendo, by speech **or silence,** word of mouth, or look or gesture." *Id.* (citation and quotation omitted) (emphasis in original).

¶ 12 The trial court reasoned that there was no fraud here because Appellee was "sincere in her belief" that Appellant was the father and therefore "the misrepresentation she made to [Appellant] was not made with the intent to deceive...." (Trial Ct. Op., 6/26/07, at 6.). The trial court was thus "convinced that [Appellee] believed [Appellant] to be her son's father." (*Id.*). Even though the court concedes that Appellee's assertions about paternity amount to "a misrepresentation in this case, since the genetic test showed that [Appellant] is not P.J.'s father," it asserts fraud is not implicated because "a misrepresentation standing alone and made in good faith is not a problem." (*Id.* at 5.). The determination that Appellee's persistent denials of any other possible father are made in "good faith" is in conflict with our law of fraud in paternity actions, and contravenes common sense.

¶ 13 This error is strikingly similar to that which we encountered in *Gebler, supra.* There, the appellant believed he was the father and "held the child out as his own." *Id.* at 2. Just as in the present case, the appellant signed an acknowledgement of paternity and "helped [the appellee] prepare for the birth, attended the birth, and had his name put on the birth certificate." *Id.* Even though the relationship ended when the child was only nine months old, the appellant paid support and exercised his custody rights. *Id.*

When the appellant became suspicious that the child was not his, he had a private DNA test performed, which excluded him as the father. *Id.*

¶ 14 At the paternity hearing, the trial court determined that estoppel should apply, finding that because the appellant had held the child out as his own and had failed to show fraud, application of the doctrine was warranted. The court observed that Appellant was precluded "from challenging the status that he previously accepted." *Id.* at 3. On review, this Court reversed, explaining that: "The court disregards the fact that [the appellant] was operating under the belief that he in fact was the father, because Mother never indicated to him that it was possible that another man could be the father." *Id.* We held that this silence on the part of the mother constituted fraud, explaining:

> Clearly, [the m]other is holding all the cards here; only she knew that another man might be the biological father and only she could inform [the appellant]. The mother is the only one who knows who the possible fathers are, at least until a paternity test is done. Mother's failure to provide [the appellant] with the information that only she knew, and which she knew if she divulged would provide [appellant] with a clear understanding of the matter, lulled him into believing he was the father. Mother concealed that which should have been disclosed, and [the appellant] acted accordingly. The trial court noted that [the m]other might have thought the child was most likely [the appellant's] rather than the other man she was having relations with. However, she was the one that knew she was having relations with someone else and never revealed it to [the appellant]. This constitutes fraud or at least misrepresentation, and it is undisputed in the record.

*Id.* at 4. We recognized that the considerations inherent in the estoppel doctrine were not implicated, and also acknowledged that the "strong public policy against permitting a party who has acted in reliance upon a misrepresentation to suffer harm as a result precludes the application of estoppel." *Id.* at 5.

¶ 15 We also considered similar facts in *N.C., supra.* There, the appellant challenged paternity to dismiss a support order nearly ten years after the birth of the child. *N.C., supra,* at 501. The appellant and the mother were married during the conception and birth of the child, and divorced when the child was five. *Id.* The appellant raised the child as his own for nearly nine years, until he had genetic testing performed that excluded him as the biological father. *Id.* at 502, note 4. At the subsequent hearing, the mother reluctantly conceded that she had in fact had sexual relations with another man at the time of conception, but also testified that she never had any reason to believe that anyone other than the appellant was the biological father. *Id.* at 501. The hearing officer and the trial court found that estoppel applied, and that the mother did not make misrepresentations to the appellant, fraudulent or otherwise. *Id.* This Court reversed, holding:

> [The a]ppellant operated for more than a decade under the false pretense that he was, indeed, [the child's] father. It is undisputed that this subterfuge was a direct result of [the mother's] misrepresentation by omission and intentional misstatements to [a]ppellant. Furthermore, a review of the record infers that [a]ppellant would not have held [the child] out as his own had it not been for [mother's] fraudulent conduct. We, therefore, find that [a]ppellant made out

a case of fraud and that the trial court abused its discretion.

*Id.* at 504.

¶ 16 Another important difference between Appellee in the present case and the mothers involved in the cases cited above is that here, Appellee has not acknowledged the possibility of another father. Even when confronted with the results of two genetic tests that exclude Appellant as the biological father, she does not relent in her assertion that he is in fact the biological father. When asked at the hearing if she still believed that Appellant was the father, she responded "I'm 100 percent positive. I mean, unless I'm married, and my son is Jesus." (N.T. Hearing at 27.). The trial court recognized that she was incorrect, stating: "This [c]ourt is certainly aware in the face of the paternity test results, that what [Appellee] said was not true." (Trial Ct. Op. at 6.). The court reasoned that Appellee "did not understand the scientific certainty of the DNA test, [as she] protest[ed] that both tests had to be wrong." (*Id.*). However, this conclusion has no support in the record; there were no questions asked of Appellee about her understanding of the test. Furthermore, her understanding of the reliability of the tests has no bearing on whether she had information about other potential fathers that she should have disclosed. This conclusion by the trial court improperly minimizes the simple and unavoidable fact that Mother's assertion is not true, and that she has consistently refused to recognize that someone other than Appellant is the father of her child.[1]

¶ 17 The trial court also found significant P.J.'s age, noting that Appellant's actions for the "first eleven years of P.J.'s life" warranted estoppel. (Trial Ct. Op. at 6.). However, the child's age in the present case is similar to that of the child in *N.C.*, approximately ten, and identical to the time period in *Doran,* eleven years;[2] in both cases we held that the appellants were not estopped from denying paternity when the mother had concealed the possibility of other fathers.

¶ 18 Another significant difference between the present case and other estoppel cases is the relative relationships of the appellants to the children. In *Doran, N.C.,* and *Gebler,* the appellants actively supported and raised the children as their own until genetic tests revealed that they were not the biological fathers. Here, there was very little contact as the child never resided with Appellant, and Appellee acknowledged there were long periods of no contact whatsoever. If the principles of estoppel, the protection of children, of families, and the prevention of the traumatic removal of a substantive father from a child's life, were counterbalanced by fraud when there were such bonds, those principles are certainly not served here where there is virtually no relationship at all. The child recognized another man as the father who was "there for him every day," and the fraudulent omission of the mother is materially similar. Also, here as in each of the above cases, Appellant completely discontinued all support and visitation as soon as he learned the results of the DNA

---

1. The dissent argues that unlike the situation in *Gebler* and *N.C.,* the mother here "showed her hand." *Dissenting Statement, infra.* However, this is not supported by the record which contains no evidence whatsoever that Mother ever acknowledged the possibility of another biological father, even when confronted with the results of two paternity tests under oath.

2. We note that the child in *Gebler* was only eighteen months old, but the age of the child was not central to the fraud and estoppel analysis.

test and he certainly did not hold the child out as his own thereafter.

¶ 19 Yet another compelling difference between Appellee here and the mother in *N.C.,* is that in *N.C.,* although the mother continued to assert her belief that the appellant was the father, she did finally admit that circumstances had existed to explain the results of the DNA test, namely that she had sexual relations with another man. Here, although mother "holds all the cards" as to what the possible explanation could be, she persists in refusing to show her hand, even under oath. *See Gebler, supra.* Failing to identify such a continued omission as fraud merely because there has been no affirmative acknowledgement of the hidden truth defies both our law and common sense; we will not countenance a rule which would require us to turn such a blind eye to either. The evidence of fraud here is clear.

¶ 20 However, although a finding of fraud precludes the application of paternity by estoppel, we find that the trial court's application of the law of estoppel to the circumstances presented here compels us to address the doctrine.

¶ 21 In assessing the propriety of estoppel, the trial court found that Appellant's actions during the first eleven years of the child's life warranted application of the doctrine, noting: "[W]hile not exhibiting particularly devoted behavior, [Appellant] saw the child, he paid support, he signed the birth certificate and an acknowledgement of paternity, he bought the child gifts and clothing, he filed for custody, he went to several of the child's birthday parties, and he tried to locate [Appellee] and the child when he lost track of them." (*Id.*). Thus, the court reasoned, "by taking this road, [Appellant] set up a situation in which [the child] knew and accepted him as father" and should be estopped from now denying his paternity. (*Id.* at 7.).

¶ 22 As we have noted, the policy concern that undergirds our law of paternity by estoppel is the protection of children and of the family unit:

> Estoppel is based on the public policy that children should be secure in knowing who their parents are. If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father.

*Brinkley v. King,* 549 Pa. 241, 701 A.2d 176, 180 (1997);[3] *see N.C., supra,* at 503. The classic presentation of estoppel cases was discussed by our Supreme Court in *John M. v. Paula T.,* 524 Pa. 306, 571 A.2d 1380 (1990):

> In these cases, it is recognized that, under certain circumstances, a person might be estopped from challenging paternity where that person has by his or her conduct accepted a given person as father of the child. **The classic example of this principle is where a man who has lived with a woman and her children for a number of years and has held himself to the world as the father of said children, may be estopped from seeking court-ordered blood tests in a belated attempt to deny paternity.** These estoppel cases indicate that where the principle is operative, blood tests may well be *irrelevant,* for the law will not permit a person in **these situations** to challenge the status which he or she has previously accepted.

---

**3.** Notably, *Brinkley* dealt with a challenge to a denial of blood tests, not a post-test paternity challenge. The concern with children learning someone is not their biological father is not implicated once the test is conducted and results are known, as they are here.

*Id.* at 1386 (internal citations omitted) (emphasis added).

¶ 23 The present case is far from the "classic case" described in *John M.* Appellant never lived with Appellee, and has had very little contact with the child, with some lengthy periods of no contact at all. Contrary to the trial court's findings that a parent-child relationship existed, the record shows that Mother herself acknowledged Appellant's infrequent contact and his failure to develop a parent-child bond with P.J.:

> Mother: In the past my husband was there from the time PJ was about— when we got back together PJ was a few months old, two to four months he was. And me and my ex, the man that I dated before him, I end up marrying after him, and we dated, and he—for a while he called him dad when [Appellant] wasn't around for two years. We had a fight. **For years he didn't call. He didn't come around. He didn't do anything,** but that's when he tried to get the custody. He came back into his life, and **I had to explain to PJ, we, you know—because PJ didn't remember him younger. I have to explain to him it's like you have two dads because you have somebody that's basically there for you every day, but this is your biological,** you know.

(N.T. Hearing at 19) (emphasis added).

¶ 24 Additionally, and perhaps even more significant, while Appellant and Mother both acknowledged that the child referred to Appellant as "Dad," Mother also testified that P.J. has referred to her former husband as "Dad." (*Id.*). This is significant for a number of reasons: first, this was the man whom Appellee dated prior to her relationship with Appellant, married shortly thereafter, and remained married to until sometime in 2004, just 2½

years prior to the hearing; and second, it was this man with whom P.J. formed a parent-child relationship. (*Id.* at 10, 19.). Thus, it was Appellee's ex-husband, and not Appellant, who was "there for [P.J.] every day," while Appellant was merely the child's "biological." (*Id.*).

¶ 25 We find it particularly telling that Appellee "[had] to explain" to P.J. who Appellant was, since the child had no memory of him because "[Appellant] didn't come around ... [he] didn't do anything." (*Id.*). This is hardly the parent-child bond that estoppel was designed to protect. *See Doran, supra.* When Appellee explained Appellant to P.J., she did not describe him as someone with whom P.J. could form a parent-child relationship, but rather merely explained Appellant's biological relationship to P.J., which we now know does not exist. As the guiding policy behind the doctrine of paternity by estoppel is to avoid telling a child "the father he has known all his life is not in fact his father," *Brinkley, supra,* we cannot find estoppel to be properly applied here where the child looked to another man as the father who was there for him "every day," and has already been informed of the results of the DNA test. Indeed, when Appellee was asked if the results of the genetic tests had any impact on P.J., she said "**Not at all. He understands. I would have thought he would be upset with him. He's not upset. He's not mad.**" (N.T. Hearing at 10) (emphasis added).

¶ 26 The trial court's rationale allows Appellee to continue in her fraud by omission, both to Appellant and now to the court, and rewards her for it. The decision would also allow Appellant to suffer continued harm as a result in direct contravention of the policies of fraud and estoppel. *See Gebler, supra,* at 5. This is an abuse of discretion. We find that Appellant's actions in support of P.J. were

induced not by his own choice but by Mother's failure to be forthcoming about the true probabilities of his paternity. Accordingly, we hold that Appellee's actions constitute fraud, and that application of the principle of paternity by estoppel is precluded.

¶ 27 Order reversed. Case remanded for proceedings consistent with this opinion.

¶ 28 KLEIN, J. files a Dissenting Opinion.

## DISSENTING OPINION BY KLEIN, J.:

¶ 1 Because Appellant Severino was aware that Appellee Glover had other sexual partners during the time of conception, I cannot agree with the majority that fraud has been demonstrated. Therefore, I must dissent.

¶ 2 Here, knowing the possibility that he was not the father, Severino still signed an acknowledgement of paternity, had his name on the birth certificate, and, although the relationship ended when the child was only nine months old, paid support and exercised his custody rights.

¶ 3 The majority primarily relies on three cases to overturn the trial court's finding that there was fraud on the part of the mother: *Gebler v. Gatti*, 895 A.2d 1 (Pa.Super.2006); *J.C. v. J.S.*, 826 A.2d 1 (Pa.Super.2003); and *Doran v. Doran*, 820 A.2d 1279 (Pa.Super.2003). I strongly disagree that these cases require this result, and in fact believe their holdings compel the opposite result.[4] Therefore, I would affirm the trial judge.

¶ 4 In all three cases cites by the majority, the finding of fraud was supported by the factual determination that the mother knew of at least the possibility that more than one man might be the child's father. However, in all of these cases the mother kept that knowledge from the putative father. Thus, the "father" was fraudulently induced into accepting financial responsibility and/or providing emotional support for the child. In the instant matter, the putative father knew the entire time that other men might have been the father. Despite this knowledge, Severino accepted, at a minimum, financial responsibility for this child.

¶ 5 Using *Gebler* as an example, the key difference is that there the Appellant had no idea that the mother was having sexual relations with other men during the period the child was conceived. While the trial court believed the mother *thought* that the Appellant in *Gebler* was the father, she alone knew there was a possibility that someone else was the father. That was true even if the majority of her sexual relations were with the Appellant.

¶ 6 As this Court said in *Gebler*:

Clearly, Mother is holding all the cards here; only she knew that another man might be the biological father and only she could inform [Appellant] Gatti. The mother is the only one who knows who the possible fathers are, at least until a paternity test is done. Mother's failure to provide Gatti with the information that only she knew, and which she knew if she divulged would provide [Appellant] Gatti with a clear understanding of the matter, lulled him into believing he was the father.

895 A.2d at 4.

¶ 7 The same key difference is present in *Doran, supra; J.C., supra;* and *N.C. v.*

---

4. I do agree with the majority that the trial court came to improper conclusions of law regarding its determination of fraud. However-er, I believe that the trial court nonetheless arrived at the correct result.

*M.H.*, 923 A.2d 499 (Pa.Super.2007), all relied on by the majority. In all those cases the mother knew someone else might be the father but did not reveal the information. In those cases, while the mothers may have believed the respective Appellants were the fathers, the mothers were the only ones that knew someone else, nonetheless, *could* be the father.

¶ 8 The difference in this case is that Severino *knew* that Glover was having sex with other men during the time of conception and there was the possibility that the child was not his. Unlike *Gebler, Doran, J.C.* and *N.C.*, the mother showed her hand to Severino, the appellant. Therefore, there was no fraud. That Glover may have believed and apparently continues to believe (against all evidence) that Severino is truly the father, is immaterial because Severino has known for the entire relevant period of time that Glover was sexually active with other men. Whether Glover "showed her cards" or Severino saw them does not matter—what matters is that Severino knew what cards Glover held. To carry the metaphor further, one simply cannot bluff a person who knows what cards are being held. As the majority points out, fraud requires a justifiable reliance on the misrepresentation. Here Severino knew all the salient facts, whether Glover told him or not. Therefore there can be no justifiable reliance on the misrepresentation. The majority cannot adequately explain this difference away.

¶ 9 Severino, knowing he might not be the father, assumed the role of parent by having his name put on the birth certificate, paying support and seeking partial custody, among other things. It now is too late to claim he is not the father. He is the father by estoppel, and since there is no fraud, he cannot now use the DNA test to avoid the responsibility he assumed.

¶ 10 The record fully supports the trial judge's conclusion that there was no fraud (albeit for different reasons).

Severino testified:

That I did was I went to—I wasn't there to see the birth. I wasn't holding her hand. As a matter of fact, I was really skeptical because from the first time she said that you're pregnant—that she was pregnant and you're the father, I said, how is that possible? And I swear under oath today that that was my words. I am not the father. How is that possible? And I knew that she had several other partners.

N.T. Hearing, 4/20/07, at 32.

Question (Atty. Holmes): And when you were in a relationship with Ms. Glover, did she ever tell you that she was seeing other people?

Answer: Yes. I knew she was seeing other people. We didn't establish we knew, and it was an open relationship. I was in college. I mean, I would come to her apartment, and I knew she was seeing other people. It was never anything like, oh, you're my boyfriend. You're my girlfriend. I plan on marrying you.

*Id.* at 45.

¶ 11 It is clear from Severino's own words that he had absolutely no justifiable reason to rely on Glover's assertion that he was the father. Severino claims throughout the twelve years that he accepted paternity and paid child support, if only intermittently and upon court order under threat of contempt, he suspected that he was not the father. But not once in the first twelve years of the child's life did Severino ever challenge his paternity in court. I note from my review of the record that Severino had ample opportunity to raise the issue because the record is replete with petitions to modify support

payments as well as hearings for contempt for failure to pay support.

¶ 12 One might imagine that if Severino actually doubted his paternity from the time he knew Glover was pregnant, he would have raised that issue. Instead, Severino testified he was at the hospital at the time of the birth and knowingly signed the birth certificate. Then, six months later, when he was told he needed to sign support documents at the Department of Domestic Relations, he willingly went to the office and signed the paperwork that he had every reason to believe obligated him to pay child support. Severino did all of these things despite his testimony that he knew the entire time he was with Glover that she was seeing other men and that any of these other men might well be responsible for the pregnancy. Severino claims that instead of acting upon his independent knowledge of Glover's amorous activities, he reasonably relied upon her statement to him that he was the father. Given Severino's admitted knowledge, there is no way to view his reliance on Glover's assertion as being reasonable. Because there was no justifiable reliance, there can be no fraud. *See N.C., supra.*

¶ 13 That Severino cannot demonstrate he was the victim of fraud does not automatically end the inquiry. We must still examine whether paternity by estoppel should apply. The majority notes that this issue is not as cut and dried as the trial court apparently believes. I would agree that the evidence could support a finding that even absent fraud, Severino should be released from his self-imposed obligations. However, because the evidence can be so interpreted does not mean that it must. Here, the trial court accepted such evidence sufficient for it to conclude that there was enough of a bond between Severino and the child to forbid Severino from disclaiming his duty of support.

¶ 14 In determining that estoppel does not apply, the majority makes much of the fact that Severino did not emotionally bond with the child, essentially overruling the trial court's determination on this finding. However, whether Severino bonded with the child is not dispositive.

¶ 15 The cases cited by the majority make it clear that bonding with the child is not a prerequisite to any ruling. While bonding may be considered, it is not the end of the inquiry. Both *Doran* and *J.C.* also speak of the *financial* support of the child as being important.

> Estoppel in paternity actions is merely the legal determination that because of a person's conduct (e.g., holding out the child as his own, **or supporting the child**) that person, regardless of his true biological status, will not be permitted to deny parentage.

*J.C.*, 826 A.2d at 4 (Pa.Super.2003); *Doran*, 820 A.2d at 1283 (Pa.Super.2003) (emphasis added). Both cases are quoting *Fish v. Behers*, 559 Pa. 523, 741 A.2d 721, 723 (1999).

¶ 16 Relying on financial support or emotional bonding in determining estoppel only makes sense. If emotional bonding were the only measure by which to determine paternal estoppel, then absentee fathers would automatically gain a legal advantage. Telling a father he may obtain a future benefit from withholding his care from his child (and it must be remembered that in these cases the "father" believed that he was actually the child's father) is a poor lesson to teach. Accepting, if only for the sake of argument, the majority's assertion that Severino provided no emotional support for the child and then using that fact to allow Severino to renounce his responsibilities is simply rewarding Severino for absent parenting.

¶ 17 "[G]enerally, estoppel in paternity issues is aimed at achieving fairness as between the parents by holding both mother and father to their prior conduct regarding paternity of the child." *Conroy v. Rosenwald,* 2007 PA Super 400, ¶ 10, 940 A.2d 409 (2007), *citing Freedman v. McCandless,* 539 Pa. 584, 654 A.2d 529, 533 (1995). Here, Severino accepted the mantel of paternity voluntarily and made support payments for 12 years. He provided gifts as well as financial support to the child. Under the facts of this case, since mother had multiple sexual partners during her college years when the child was conceived, at this late date it is probably impossible to find and obtain support from the biological father. If the child has been relying on the support payments for twelve years, it is unfair to the child to terminate the support at this late date. The prior conduct of both Glover and Severino in this regard weighs heavily in favor of maintaining this financial support. I believe that the majority has improperly relied only on the bonding aspect and has ignored the fact that Severino has been providing financial support for the child for over a decade.

¶ 18 I cannot say that the trial court abused its discretion in concluding that fairness requires holding Severino to his prior conduct as father. Severino clearly, by his own testimony, knew that he was not necessarily the father of the child. Despite this knowledge he accepted the mantel of paternity and the concurrent financial responsibility. Severino was, therefore, not a victim of fraud and so there is no reason to allow him to renounce his responsibilities. Therefore, I believe that the trial court's order should be affirmed and accordingly must dissent.