J-A19012-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ESTATE OF PAUL ANTHONY SENTS, II, STACIE A. SENTS, PAUL A. SENTS | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : : | |
| v. | : : : | |
| | : | No. 496 MDA 2022 |
| KIRSTIN DELLINGER | : | |

Appeal from the Order Entered February 24, 2022
In the Court of Common Pleas of York County Civil Division at No(s):
2020-FC-000925-23

BEFORE:   BOWES, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.:                    **FILED: OCTOBER 18, 2022**

The estate of Paul Anthony Sents, II ("Estate"), appeals from the February 24, 2022 order dismissing with prejudice the Estate's complaint to disestablish the acknowledged paternity of Paul Anthony Sents, II ("Decedent") and obtain paternity testing to establish the paternity of two-year-old A.S.  After review, we affirm.

A.S. was born to Kirstin Dellinger ("Mother") in December 2019.  At the time of A.S.'s birth, Mother had been in a relationship with Decedent since early April 2019.  N.T., 1/21/22, at 6, 109-10.  Decedent and Mother were not married.  Shortly after A.S.'s birth, Decedent, with the consent of Mother, signed an acknowledgement of paternity pursuant to 23 Pa.C.S. § 5103(a),

_____

[*]  Former Justice specially assigned to the Superior Court.

and he never challenged the acknowledgement. Decedent committed suicide in May 2020, when A.S. was five months old.

On January 19, 2021, the Estate filed a complaint against Mother and Dustin Sweitzer, Mother's former paramour. In the complaint, the Estate alleged that Decedent signed the acknowledgment of paternity solely based upon Mother's fraudulent misrepresentation that he was the father of A.S. The Estate averred that Decedent's parents, Stacie A. Sents ("Stacie") and Paul A. Sents ("Paul"), submitted themselves and A.S. to private genetic testing, which established that Stacie and Paul were not genetically related to A.S.[1] The Estate sought to void the acknowledgment of paternity and requested paternity testing of Sweitzer for the purpose of establishing his paternity of A.S. This complaint is the only legal action concerning A.S.'s paternity.

---

[1] To the extent the relief sought by the Estate was a court order regarding A.S.'s paternity and not damages against Mother or Sweitzer, the Estate's filing of a complaint against Mother and Sweitzer as opposed to a petition regarding A.S. is procedurally questionable. We also note that counsel for the Estate uses the terms "complaint" and "petition" interchangeably. Nevertheless, the certified record does not reveal whether Mother or Sweitzer raised this inconsistency in the trial court, and we do not address it *sua sponte*. For the sake of uniformity, we refer to the pleading as a complaint.

Similarly, the certified record does not indicate whether Stacie and/or Paul are executors of the Estate. However, because Mother challenged neither the identity of the party or parties instituting this action, nor the standing of the Estate, Stacie, or Paul, we likewise do not address these issues. ***See In re Estate of Brown***, 30 A.3d 1200, 1205 (Pa.Super. 2011) (noting this Court cannot raise a standing issue *sua sponte* and a party who does not object to standing at the earliest opportunity waives any such challenge).

On February 3, 2021, Mother filed an answer to the complaint. Sweitzer did not file a responsive pleading. Instead, he obtained private paternity testing with Mother's consent. Based upon the private paternity test, the parties agreed that Sweitzer was not A.S.'s father. N.T., 1/21/22, at 28-29. By April 12, 2021 order, the trial court dismissed Sweitzer from the action by agreement of the parties.

The trial court conducted hearings on the matter on January 21, 2022, and February 22, 2022. At the hearings, Stacie, Paul, and Decedent's sister testified on behalf of the Estate. The Estate also called Mother as if she were on cross-examination and Sweitzer as a rebuttal witness to Mother's testimony. Mother also testified on her own behalf.

Notably, during the hearing the Estate attempted to introduce the results of the private DNA testing obtained of Stacie and Paul purportedly showing that Stacie and Paul had no genetic connection to A.S. N.T., 1/21/22, at 106. The exhibits in question were reports of DNA test results from Genex Diagnostics, a company in Canada. *See* Estate Exhibit 1 and 2. One report, dated July 22, 2020, purported to analyze the relationship between A.S. and Paul. The second report, dated August 13, 2020, purported to analyze the relationship between A.S. on one hand, and Paul and Stacie on the other, to determine the likelihood that Decedent was A.S.'s father. Both test reports contained, on their face, disclaimers by Genex Diagnostics about the limitations of the test or its accuracy. Such limitations included the unverified

assumption that Stacie and Paul were genetically related to Decedent, and Stacie and Paul's failure to submit to the laboratory's identification protocols and laboratory-selected collection facility. The reports noted that the results were intended only for personal knowledge and not to establish legal identity or familial relations.

Mother objected to the admission of the reports and any testimony that the results of the reports were valid. N.T., 1/21/22, at 11, 106. Mother's objection was based upon the Estate's failure to present testimony of a records custodian from the testing company to establish the testing procedure, chain of command, and other reliability or accuracy issues. *See id*. The trial court took the issue under advisement based on its concern that the Estate laid no foundation for how the testing company arrived at its conclusion that Stacie and Paul were not related to A.S. and the lack of expert testimony to support this conclusion.[2] *Id*. at 106-08. At the second hearing, the trial court sustained Mother's objection and ruled the tests were inadmissible without testimony from an appropriate Genex employee concerning the methodology of the testing. N.T., 2/22/22, at 28-29.

_____

[2] The trial court noted it found the testimony of Decedent's sister to be credible that she helped Stacie and Paul administer the tests, followed the testing company's instructions, and mailed the results directly to the testing company. N.T., 1/21/22, at 106-08. It also stated it would disregard that Stacie and Paul twice obtained a DNA sample from A.S. and instructed the testing company to analyze it without Mother's knowledge or consent, as that was not the issue before the court. *Id*.

Also at the hearings, Stacie recalled that Decedent and Mother announced the pregnancy several weeks after they started dating by presenting her with a box containing a onesie and announcing that she and Paul were going to be grandparents. N.T., 1/21/22, at 41-42. Stacie and Paul both testified they were suspicious from the outset that Decedent was the father of Mother's baby based upon how early in the relationship Mother became pregnant, as well as Decedent's questioning his paternity prior to A.S.'s birth when he found "panties" under the seat of Mother's car. *Id*. at 41-42, 45-46, 76. Despite their misgivings, Stacie and Paul accepted Decedent's declaration that he was the father and treated A.S. as their grandson. *Id*. at 40, 69, 83.

After Decedent died, his sister arranged for the genetic testing. Once the family obtained the results, Stacie terminated all contact with A.S., ostensibly to avoid causing the child emotional distress when he got older. *Id*. at 47. Stacie and Paul believed Mother took advantage of Decedent's poor mental health and desire for a family to convince him to sign the acknowledgement of paternity. *Id*. at 57-59, 80-83. They also insinuated that Mother had a financial motive, noting that Decedent changed the beneficiary of his military life insurance policy from Stacie to Mother after A.S. was born and that Mother currently receives Decedent's social security death benefits on A.S.'s behalf. *Id*. at 61-65.

During Mother's testimony, she recounted her and Decedent's excitement when they learned she was pregnant early in their relationship together. N.T., 1/21/22, at 6, 10, 24, 37; N.T., 2/22/22, at 112. She tracked her periods and believed Decedent was the father based upon the timing. N.T., 1/21/22, at 9, 23. She acknowledged having some initial reservations about whether Sweitzer could be the father, but believed he was not because of the timing of her last intercourse with Sweitzer. *Id*. at 8-9. Mother asserted her relationship with Sweitzer ended approximately one month before she began a relationship with Decedent. *Id*. at 15.

Early in her pregnancy, Sweitzer questioned whether he was the father, which caused some friction between her and Decedent. *Id*. at 21-29, 37. According to Mother, however, any doubt was put to rest by her doctor's estimation of her conception date in mid-April 2019, which aligned with her tracking of her ovulation and timing of sexual relations with Decedent. *Id*. at 8-9. From Mother's perspective, Decedent accepted her doctor's estimation and agreed he was the father. *Id*. at 21, 25-26. Decedent attended all of Mother's pre-natal appointments. *Id*. at 114. She and Decedent moved in together in September 2019 in preparation for the baby's arrival. *Id*. at 17. Decedent and Stacie were present in the delivery room when Mother delivered A.S. at 36 weeks gestation due to preeclampsia. *Id*. at 9, 114. Decedent signed the acknowledgement of paternity a few days later, declining paternity testing. *Id*. at 14, 115.

Mother and Decedent ended their relationship around the end of March 2020, or the beginning of April 2020, when A.S. was four or five months old. *Id*. at 16. Mother was aware prior to A.S.'s birth that Decedent's mental health troubled him at times, but she observed Decedent's mental health spiral downwards a few months after A.S.'s birth. *Id*. at 20. Around that time, the military discharged Decedent, he lost his job, his ex-girlfriend was pressing charges against him, and A.S. cried a lot from colic. *Id*. at 117. Decedent experienced a mental health episode and was violent towards Mother. *Id*. at 120. Mother called Stacie and Paul for help. After this, Decedent was hospitalized for a week in April 2020 and moved in with Stacie and Paul upon his discharge. *Id*. at 17. Child protective services became involved and instructed Mother to wait for Decedent's new medication to take effect before he saw A.S. *Id*. at 18. During that time, Mother and A.S. saw Decedent virtually. *Id*. at 17-19. In May 2020, Decedent resumed seeing A.S. at Stacie and Paul's house until Decedent's death at the end of the month. *Id*. Following Decedent's death, A.S. continued to spend weekends at Stacie and Paul's house while Mother worked her nursing shifts until Stacie and Paul suddenly ceased contact. *Id*. at 31-32.

Mother was upset that Stacie and Paul tested A.S. without her knowledge or consent and believes Stacie and Paul's decision to cease contact with A.S. in August 2020 was in contravention to Decedent's wishes. Upon learning of Stacie and Paul's test results, Mother "thought that they did

- 7 -

something to alter the tests, that it was not either done correctly or something went wrong[.]" *Id*. at 11-13. She does not wish A.S. to have any further testing. *Id*. Mother agreed to Sweitzer's paternity testing after receiving the complaint because she believed it was inevitable the court would order his testing. *Id*. at 8. She was not surprised to learn that testing ruled out Sweitzer as A.S.'s father because she still believes Decedent was A.S.'s father based on the conception date. N.T., 2/22/22, at 10. Mother testified multiple times during the hearing that only Sweitzer or Decedent could be the father because she did not have intercourse with anyone else during the requisite timeframe. N.T., 1/21/22, at 32, 36; N.T., 2/22/22, at 6, 7, 10.

Mother acknowledged she told Decedent she was sure he was the father, particularly after her doctor provided her with a better idea of dating her pregnancy. N.T., 1/21/22, at 20; *see also* Estate Exhibit 7 (text exchange between Mother and Decedent dated May 4, 2019, wherein Mother and Decedent agree she is pregnant with his baby); *see also* Estate Exhibit 4 (text exchange between Mother and Decedent dated May 14, 2019, wherein Mother expressed her reluctance to emotionally invest in their relationship 100% until her doctor's appointment but assuring him it was his or Sweitzer's baby).

By order entered February 24, 2022, the trial court dismissed the Estate's complaint, ruling that the Estate did not carry its burden of proving fraud, duress, or material mistake of fact by clear and convincing evidence. Order, 2/24/22, at 4. The court noted Mother's testimony that only Decedent

could be the father, the agreement by the parties that Sweitzer was not the father based upon his private DNA test, and the inadmissibility of the genetic test results obtained by Stacie and Paul. *Id*. at 4-5. The court found that while the Estate "certainly raised matters which create suspicion," it did not carry its burden of proof to permit the court to set aside Decedent's acknowledgment of paternity. *Id*. at 5.

The Estate timely filed a notice of appeal and a concise statement of errors complained of on appeal. The trial court issued an Pa.R.A.P. 1925(a) opinion on April 13, 2022.

On appeal, the Estate presents the following issues for review.

1.  The [t]rial [c]ourt committed an abuse of discretion and erred as a matter of law by failing to consider the credible testimony of [Stacie and Paul] regarding the DNA testing results of two separate testing kits which suggested no familial relationship between themselves and [A.S.].

2.  The [t]rial [c]ourt committed an abuse of discretion and erred as a matter of law by not permitting properly introduced text message exhibits of [Decedent], which were in text conversations directly with Mother, regarding his state of mind, concerns regarding the conception date of the minor child, Mother's misrepresentations regarding other sexual partners during the possible time of conception, . . . which supported [the testimony of Stacie and Paul] and the contents of [the Estate's complaint] regarding Mother's fraudulent actions.

3.  The [t]rial [c]ourt committed an abuse of discretion and erred as a matter of law by failing to consider the well-established public policy which suggests that children should be secure in knowing who their parents are.

4.  The [t]rial [c]ourt committed an abuse of discretion and erred as a matter of law by failing to consider the public

- 9 -

> policy and the Commonwealth's interest regarding the duty of parents to support their children, both financially and emotionally.

Estate's brief at 9-10.

The crux of the Estate's argument is that Decedent's acknowledgement of paternity is invalid based upon fraud by Mother. *See id*. at 24-31. The Estate contends that it proved Mother fraudulently induced Decedent to acknowledge paternity by insisting he was the father and failing to inform him that she had a third sex partner who possibly could be the father. *Id*.

We review orders in paternity matters for an abuse of discretion. *S.N.M. v. M.F.*, 175 A.3d 333, 335 n.3 (Pa.Super. 2017).

> An abuse of discretion exists if the trial court has overridden or misapplied the law, or if there is insufficient evidence to sustain the order. Moreover, resolution of factual issues is for the trial court, and a reviewing court will not disturb the trial court's findings if they are supported by competent evidence. It is not enough [for reversal] that we, if sitting as a trial court, may have made a different finding.

*Vargo v. Schwartz*, 940 A.2d 459, 462 (Pa.Super. 2007) (citations omitted). "The finder of fact is entitled to weigh the evidence presented and assess its credibility." *Id*. In so doing, the finder of fact "is free to believe all, part, or none of the evidence and [we as an appellate court] will not disturb the credibility determinations of the court below." *Id*.

The relevant portion of the statute governing acknowledgments of paternity provides as follows.

> (a) Acknowledgment of paternity.-- The father of a child born to an unmarried woman may file with the Department of Public

- 10 -

Welfare, on forms prescribed by the department, an acknowledgment of paternity of the child which shall include the consent of the mother of the child, supported by her witnessed statement subject to 18 Pa.C.S. § 4904 (relating to unsworn falsification to authorities). In such case, the father shall have all the rights and duties as to the child which he would have had if he had been married to the mother at the time of the birth of the child, and the child shall have all the rights and duties as to the father which the child would have had if the father had been married to the mother at the time of birth. . . .

. . . .

(g) Rescission.—

(1) Notwithstanding any other provision of law, a signed, voluntary, witnessed acknowledgment of paternity subject to 18 Pa.C.S. § 4904 shall be considered a legal finding of paternity, subject to the right of any signatory to rescind the acknowledgment within the earlier of the following:

(i) sixty days; or

(ii) the date of an administrative or judicial proceeding relating to the child, including, but not limited to, a domestic relations section conference or a proceeding to establish a support order in which the signatory is a party.

(2) After the expiration of the 60 days, an acknowledgment of paternity may be challenged in court only on the basis of fraud, duress or material mistake of fact, which must be established by the challenger through clear and convincing evidence. An order for support shall not be suspended during the period of challenge except for good cause shown.

. . . .

23 Pa.C.S. § 5103(a), (g) (internal footnote omitted).

By using the term "challenger" in § 5103(g), the Legislature intended to permit non-signatories to challenge the acknowledgment based upon fraud, duress, or material mistake of fact. ***R.W.E. v. A.B.K.***, 961 A.2d 161 (Pa.Super. 2008) (*en banc*). This Court explained the law regarding fraud in this context as follows.

> In ***B.O. v. C.O.***, [590 A.2d 313 (Pa.Super. 1991)], this Court stated that "when an allegation of fraud is injected in an acknowledgment of paternity case, the whole tone and tenor of the matter changes. It opens the door to overturning settled issues and policies of the law." ***B.O.***, [***supra***,] at 315. This Court went on to create a narrow fraud exception for challenging paternity, which is otherwise a settled issue based on the signed acknowledgment. We adopted the traditional elements of fraud established in Pennsylvania jurisprudence:
>
>> (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as the proximate result.
>
> ***Id***.
>
> Recent cases have moved away from this rigid five-prong test which this Court acknowledged in ***B.O.*** as problematic and somewhat circular. [***Id***.] Our recent decision of ***Glover v. Severino***, 946 A.2d 710 (Pa.Super. 2008), provides additional guidance as to the elements of fraud in the context of challenges to acknowledgments of paternity:
>
>> A misrepresentation need not be an actual statement; it can be manifest in the form of silence or failure to disclose relevant information when good faith requires disclosure. Fraud is practiced when deception of another to his damage is brought about by a misrepresentation of fact **or by silence when good faith required expression**. Fraud comprises anything calculated to deceive, whether by single act

- 12 -

> or combination, or by suppression of truth, or suggestion of what is false, whether by direct falsehood or innuendo, by speech or silence, word of mouth, or look or gesture.

*Id*. (quotations and citations omitted) (emphasis in original).

> In *Glover*, a mother had a brief sexual relationship with a putative father and became pregnant. Despite knowing that she had other sexual partners at the time of conception, the putative father signed an acknowledgment of paternity and paid child support, though his involvement in the child's life was minimal and sporadic. Mother insisted that putative father was the father of the child, despite the results of later testing that revealed he was not. This Court held that despite the mother's strong belief as to the identity of the biological father, her silence on the issue of other possible fathers and her failure to be forthcoming about the true probabilities of paternity constituted fraud by omission.

*R.W.E.*, *supra*, at 168.

In the instant case, to prove Mother engaged in fraud, the Estate relies upon the Genex genetic testing results which purport to rule out Decedent as the father based upon the lack of genetic relationship between A.S., Stacie, and Paul. Estate's brief at 24-31. It also points to Mother's supposed admission at trial and in text messages with Decedent that she had sexual relations with someone besides Decedent and Sweitzer during the timeframe in question. *Id*.

The problem with the Estate's reliance upon the Genex test results is that it failed to secure their admission at the hearing. The Estate likens this case to *Glover*, a child support case in which the legal father proved fraud by omission with paternity test results excluding him from biological parentage, thereby rendering false the mother's denials of intercourse with anyone else.

- 13 -

*See* the Estate's brief at 29 (citing *Glover*, *supra*). Yet, in *Glover*, the challenger obtained pre-hearing paternity testing through the court, a procedure provided for by a statute not applicable here. *See Glover*, *supra*, at 712; *see also* 23 Pa.C.S. § 4343(c).

Critically, the Estate does not challenge the trial court's evidentiary ruling regarding the paternity test results. In fact, it concedes that the genetic testing results were inadmissible without testimony from the testing facility. *See* Estate's brief at 25. Nevertheless, the Estate contends the trial court should have relied on those inadmissible results to prove fraud by Mother because Stacie and Paul would not have cut off relations with A.S. if they did not think the results were reliable. *Id*. at 19-20, 30-31. Phrased differently, the Estate posits that because Stacie and Paul trust the validity and accuracy of the self-administered test kits, the trial court should have as well. Similarly, the Estate attempts to circumvent the evidentiary barrier by arguing that because Mother acknowledged the existence of the test results, it is irrelevant that she disputes the testing methodology or underlying science. *Id*. at 28.

None of these arguments transforms the inadmissible test results into competent admissible evidence. Indeed, the Estate made zero effort during the hearing to authenticate the reports, establish an exception to the hearsay rule such as the business record exception, or offer expert testimony about the results, which were clearly based on scientific, technical, or other specialized knowledge. Mother's mere awareness that Stacie and Paul

possessed a report that purported to exclude a genetic relationship between them and A.S. is not tantamount to conceding the validity of them. In fact, the trial court made this precise ruling during the proceeding and the Estate insisted that it was not asking Mother to confirm the validity of the results. N.T., 1/21/22, at 11-12. Nevertheless, it revives this assertion on appeal in support of its contention that the test results are not only valid, but also constitutes clear and convincing evidence that Mother perpetrated a fraud. These efforts are futile.

Next, the Estate attempts to prove Mother's fraud by offering evidence of her supposed admission of sexual intercourse with someone other than Sweitzer or Decedent during the period of conception. *See* Estate's brief at 26-27. However, the certified record does not include the proposed facts. As noted above, Mother repeatedly testified that her only sex partners in March and April 2019 were Sweitzer and Decedent. *Cf. N.C. v. M.H.*, 923 A.2d 499 (Pa.Super. 2007) (finding fraud by omission despite exclusion of private paternity testing because the mother admitted during the hearing that she had unprotected intercourse with another man at the time of the child's conception). Indeed, there is no testimony about an undisclosed third liaison during the relevant period.

The Estate highlights a series of text messages between Mother and Decedent on June 14, 2019, regarding **Decedent's** accusation that she previously lied to him about not having any sexual partners besides him and

Sweitzer. *See* Estate's brief at 26. The trial court sustained Mother's hearsay objection and ruled the Decedent's accusation was admissible only as context for Mother's responses. N.T., 2/22/22, at 4-5. Contrary to the Estate's claim that Mother admitted in these messages to having intercourse with someone else during the period of conception, Mother's texts are ambiguous. Rather than admit to additional partners, she reminded Decedent that any of her prior escapades that occurred one month before their relationship was none of his concern. *See* Estate Exhibit 5 ("I don't need to tell you who about my past or who I slept with before you . . . It was still almost a month between you and anyone else"). Moreover, counsel's cross-examination of Mother about these messages bore little fruit as Mother continued to insist that she only had intercourse with Sweitzer and Decedent and that her texts responding to Father's accusations related to Sweitzer. *See, e.g.,* N.T., 2/22/22, at 5-6. Although the Estate insists that Mother's testimony was not credible, that determination is left to the trial court, who made a credibility determination in Mother's favor. *Vargo*, *supra*, at 462.

Overall, absent the inadmissible genetic test results, the sum of evidence before the trial court was limited to (1) Mother's steadfast insistence that Decedent and Sweitzer were her only sex partners during the timeframe in question; and (2) the stipulated exclusion of Sweitzer as the father. Beyond that, the trial court rejected the Estate's witnesses who conveyed their personal suspicions that Decedent was not the father, that Mother had

additional partners, and that Mother fraudulently withheld this information from Decedent. In light of the foregoing discussion of the certified record, the trial court accurately characterized the Estate's evidence of fraud as "conjecture at best." Trial Court Opinion, 4/13/22, at 2. Thus, we discern no abuse of discretion in the trial court's conclusion that the Estate did not prove fraud by clear and convincing evidence that would warrant voiding the acknowledgement of paternity pursuant to § 5103(g)(2).

Next, we address the Estate's collection of arguments that appeal to public policy. *See* Estate's brief at 32-34. First, the assertion that Mother committed fraud simply to obtain Decedent's death benefits is wholly unsupported by the certified record. Further, despite the Estate's contentions to the contrary, the statute governing the acknowledgement of paternity provides no basis to order genetic testing for general, altruistic reasons. *See S.N.M. v. M.F.*, 175 A.3d 333, 338 (Pa.Super. 2017) (holding trial court erred by ordering paternity testing to reveal child's true paternity for the purpose of providing child with information for any future medical issues). In this vein, the Estate does not even attempt to identify an individual whom the trial court should order to be tested for these benevolent purposes.

Finally, we reject the claim that the Estate is simply attempting to serve A.S.'s best interest in knowing his family. In the view of the Estate, A.S. should be spared the trauma of believing that his father killed himself and his paternal family abandoned him when Decedent was not in fact his father.

While we are sympathetic to this argument, without clear and convincing evidence of fraud, Decedent's acknowledgment of paternity still stands. *See S.N.M.*, *supra* at 338 (holding absent proof of fraud, even if appellant was not child's biological father, he remained the child's legal father based upon his acknowledgment of paternity). Thus, contrary to the protestations of the Estate, as a matter of law, Decedent was A.S.'s father.

There is no doubt that paternity cases invoke strong emotions. However, the trial court followed established law and rendered findings that are supported by the certified record. Thus, we discern no abuse of discretion. Accordingly, we affirm the trial court's order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/18/2022