Jennifer A. ELLISON, Appellee

v.

Damoun M. LOPEZ, Appellant.

Superior Court of Pennsylvania.

Argued June 25, 2008.

Filed Oct. 15, 2008.

Sandjai Weaver, Philadelphia, for appellant.

BEFORE: LALLY–GREEN, KLEIN and GANTMAN, JJ.

OPINION BY KLEIN, J.:

¶ 1 Damoun M. Lopez appeals from the decision of the trial court refusing to set aside a prior order of paternity. We affirm.

¶ 2 Jennifer A. Ellison gave birth to her daughter on June 7, 2003. Lopez is noted as the father on the child's birth certificate. Based on Ellison's representations, Lopez acknowledged paternity. Lopez claims that: (a) he had suspicions that he was not the father from the time of conception, since he knew that Ellison had been involved with another man a few weeks before what he believed was the time of conception; and (b) when the child was two years old he noticed no family resemblance, but still waited two more years to challenge paternity. Under these circumstances, and absent fraud on the part of Ellison, of which there is no evidence, Lopez is estopped from denying paternity. Further, after noticing that the child did not resemble his family, Lopez's delay while being a part of the child's life makes it more difficult for him to disengage from the child, which further supports application of the doctrine of paternity by estoppel. Because no fraud or

misrepresentation has been shown, the trial court properly denied Lopez's request for court ordered blood tests. Like the trial court, we agree that this case is distinguishable from *Gebler v. Gatti,* 895 A.2d 1 (Pa.Super.2006). We therefore affirm.

¶ 3 A full discussion follows.

## FACTS

¶ 4 Lopez first learned that Ellison was pregnant in late August or early September 2002. (N.T. Hearing, 11/14/07, at 6.) Lopez testified that he knew Ellison had been in a sexual relationship with another man for most of that summer. *Id.* at 7. He further testified that after he learned Ellison was pregnant, he asked if she was "dealing" with somebody, and she responded that she had not been with anyone else for approximately three or four weeks. *Id.* at 7–8. Lopez testified, "I said to her only two things. I told her that if it was mine I'll accept the responsibility and that I just want to make sure we get a blood test and stuff like that." *Id.* at 7.

¶ 5 The child was born on June 7, 2003. *Id.* at 9. There was a stipulation as to paternity filed in November 2004; there had never been a blood test. *Id.* at 5. Lopez testified that he did not request a blood test because "at that time I guess I was wrapped up with [the child]. I don't know. I was scared to find the results out." *Id.* at 12.

¶ 6 Lopez again questioned whether he was the father when the child was close to her second birthday, because she did not have the features that are prominent in Lopez's family. *Id.* at 13–14. However, Lopez did not have any DNA testing performed until April 2007, when the child was four years old. *Id.* at 14–15.

¶ 7 When asked why, despite his suspicions, he waited from 2005 to April 2007 to obtain a DNA test, Lopez replied:

Yeah. It was my choice. Like I said, I was involved with [the child] from the very beginning, although I had those suspicions. At the same time, I took on the role of father wholeheartedly. I stepped up. To my knowledge I was her father. Like I said before, I was kind of fearful of the results and possibly having her taken away from me, not being able to be involved with her. That's kind of what kept me prolonging to do the test, was the fear of actually finding out that she wasn't mine.

*Id.* at 16–17. Lopez testified that he finally got a DNA test not only because of the lack of family resemblance, but also because he was having a conflict with Ellison concerning visitation. *Id.* at 20–22.

## DISCUSSION

■ ¶ 8 In this case, although the parties were not married, there is no dispute that Lopez held himself out as the father of the child. Under the doctrine of paternity by estoppel, a putative father who is not a child's biological father is estopped from challenging paternity after he has held himself out as the child's father or provided support. *See* 23 Pa. C.S.A. § 5102(b). In *Freedman v. McCandless,* 539 Pa. 584, 654 A.2d 529 (1995), our Supreme Court explained that estoppel in paternity actions is merely the legal determination that because of a person's conduct (e.g., holding out the child as his own, or supporting the child), that person, regardless of his true biological status, will not be permitted to deny parentage. *Id.* at 532–33. The doctrine is aimed at "achieving fairness as between the parents by holding them, both mother and father, to their prior conduct regarding paternity of the child." *Id.* (*citing Gulla v. Fitzpatrick,* 408 Pa.Super. 269, 596 A.2d 851 (1991)). Further, where the presumption of paternity does not apply, (like here, since the parties were not married), and if

the facts include estoppel evidence (like here), such evidence must be considered. And if the trier of fact finds that one or both parties are estopped, (here, Lopez) no blood tests will be ordered. *See Freedman, supra* (where estoppel is applied, blood test may be irrelevant because the law will not permit a person in estoppel situation to challenge the status previously accepted; only when estoppel is inapplicable will blood tests be ordered).

¶ 9 As noted, Lopez saw the child regularly, taking on the role of father, and there was a stipulated order of support. By his own admission, Lopez had an established relationship with the child. These facts were established by clear and convincing evidence, and, therefore, warrant application of the doctrine of paternity by estoppel.

¶ 10 However, the doctrine of paternity by estoppel will not be applied where fraud has been established. *See Gebler*, 895 A.2d at 4; *B.O. v. C.O.*, 404 Pa.Super. 127, 590 A.2d 313, 315 (1991). Even where the father-child relationship has been established, as is the case here, evidence of fraud may preclude application of the doctrine of paternity by estoppel. *Gebler*, 895 A.2d at 4.

¶ 11 Here, Lopez claims that he has established fraud on Ellison's part, simply because Ellison told him he was the father. We disagree.

¶ 12 The test for fraud is: (1) a misrepresentation; (2) a fraudulent utterance; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient as a proximate result. *B.O. v. C.O.*, 590 A.2d at 315. Fraud must be averred with particularity, Pa.R.C.P. 1019(b), and it must be proven by clear and convincing evidence. *Id.* This is espe-

cially true in cases of this nature, where, as a rule, a father who finds he is not the biological parent of a child he has claimed as his issue will feel he has been manipulated and deceived.

¶ 13 Here, there was no misrepresentation that rose to the level of fraud. Lopez was always aware of the possibility he was not this child's biological father, and in fact he questioned it when he first learned Ellison was pregnant. Ellison told Lopez she had been in a sexual relationship with another man during the summer, only a few weeks prior to Lopez and Ellison resuming their relationship. At the time of birth, both parties believed Lopez was the father, although Lopez always had suspicions she could be someone else's child. This is indicated by the fact that Lopez initially expressed the desire for a blood test; however, he did not get one because he was afraid the results would indicate he was not the father. Therefore, he was not misled. Instead, he made a decision to be in the child's life even though he questioned his paternity, and testified as to his doubts both before and after the child was born.

¶ 14 This is far different from the situation in *Gebler, supra*. There, Mother knew that during the time of conception she had had sexual relations with someone other than the putative father. Putative father had no idea, but Mother certainly did. Here, Lopez knew just as much as Ellison concerning the possibility that he was not the father. In fact, Ellison acknowledged her other relationship when Lopez questioned her, and Lopez suspected all along that he might not be the child's father. Despite his suspicions, Lopez chose not to act. There is no evidence of misrepresentation.

¶ 15 This Court recently found fraud in *Glover v. Severino*, 946 A.2d 710 (Pa.Super.2008). However, that case, too, can be

distinguished from the instant circumstances. In *Glover*, Mother *never* acknowledged that anyone other than Severino could be the father, and the fraud was manifested by silence and suppression of truth. Here, Lopez *knew* Ellison had recently been involved with another man, and Ellison acknowledged that. Lopez even discussed a blood test with Ellison as a precursor to his acceptance of paternity.

■ ¶ 16 Further, Lopez's suspicions that he was not the father ripened when he noticed that as the child approached the age of two, she did not resemble his family or have any of the family's prominent features. Nonetheless, he stayed involved in the child's life, thereby developing and strengthening his bond with her. It is hard enough for a parent to disengage from a child under any circumstances. As the child develops from the age of two to the age of four, the problems are compounded. Therefore, Lopez's actions for two years *after* he had clear doubts about his paternity estopped him from denying paternity. Notably, even at the hearing, at which the child was almost five years old, Lopez continued to refer to the child as "my child." (N.T. Hearing, 11/14/07, at 19, 21). *See Vargo v. Schwartz*, 940 A.2d 459 (Pa.Super.2007) ("Particularly where fraud or misrepresentation is involved, courts applying the doctrine of paternity by estoppel have taken care to consider evidence of the husband's conduct toward the child not only before the husband learned that he was not the child's biological father, but also *after* becoming aware

of his non-parentage."); *cf. Jefferson v. Perry*, 432 Pa.Super. 651, 639 A.2d 830 (1994) (despite putative father's delay in challenging paternity, there was no clear and convincing evidence of any relationship between child and appellant; doctrine of paternity by estoppel not applicable).

¶ 17 Since Lopez has failed to establish fraud, the trial court properly determined that Lopez was estopped from denying paternity. Therefore, we affirm the trial court's order denying Lopez's request to open the paternity adjudication.[1]

¶ 18 Order affirmed.

1. Lopez's claim that the court did not consider the distinction between the presumption of paternity and the doctrine of paternity by estoppel misconstrues the presumption of paternity. That presumption applies when a child is conceived during a marriage; the policy underlying the presumption is the preservation of marriages, and it applies only where that policy would be advanced by its application. *Brinkley v. King*, 549 Pa. 241, 701 A.2d 176 (1997) (plurality). With respect to Lopez's claim that the court should have allowed inquiry into Ellison's living arrangements, we agree with the court that this was not relevant to the issue of opening a paternity determination, and we defer to the court's discretion on this issue.