J-A13010-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| LAURA HORTMAN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CAMERON HORTMAN | : | No. 2352 EDA 2021 |

Appeal from the Order Entered October 18, 2021
In the Court of Common Pleas of Chester County
Domestic Relations at No(s): 00831N2019-FC,
PACSES 951117164

BEFORE: OLSON, J., DUBOW, J., and KING, J.

MEMORANDUM BY OLSON, J.: **FILED SEPTEMBER 08, 2022**

Appellant, Laura Hortman ("Mother"), appeals from the October 18, 2021 order entered in the Court of Common Pleas of Chester County that granted the petition for special relief filed by Appellee, Cameron Hortman, her ex-husband, in the underlying child support action. Appellee's petition challenged the presumption of paternity of a five-year-old male child, F.H., and requested paternity testing.[1] After careful review, we affirm.

The following facts and procedural history are not in dispute. On November 7, 2015, the parties eloped in the State of Oklahoma, where Appellee was stationed temporarily in the Air Force Reserve for pilot training,

_____

[1] An order requiring blood tests to determine paternity is interlocutory but immediately appealable. **Jones v. Trojak**, 634 A.2d 201, 204 (Pa. 1993).

while Mother was visiting him. N.T., 6/11/20, at 11. Approximately one week later, Mother returned to Pennsylvania. Appellee visited Pennsylvania for the Thanksgiving and Christmas holidays in 2015, and he returned permanently to Pennsylvania on January 22, 2016, after graduating from pilot training. *Id.* at 16.

F.H. was born in September 2016. At the time, Appellee was solely employed by the Air Force Reserve. *Id.* at 37. In January or February of 2017, Appellee also became employed as a private pilot. *Id.* at 38.

Mother and Appellee separated on July 11, 2018, and Mother commenced child support and child custody actions. On September 21, 2018, the court issued a final child and spousal support order against Appellee, which was modified in February 2019, to include only child support, but with an increased monthly amount. By order dated January 14, 2019, the court awarded Mother primary physical custody and Appellee partial physical custody two weekends per month, in addition to four evenings per month, for four hours. *Id.* at 67.

The parties reconciled in March of 2019. However, they separated again on June 27, 2019, and child support and custody litigation resumed. On August 2, 2019, the trial court issued an *interim* child support order against Appellee. On that same date, Appellee filed the subject petition for special relief, approximately one month before F.H.'s third birthday. In his petition,

Appellee sought to dispute paternity. Appellee and Mother divorced the following month.

The parties' divorce was precipitated by Mother's extramarital sexual encounter on December 12, 2015, with Patrick Murphy ("Murphy"), with whom Mother entered a romantic relationship in the summer of 2015, prior to her elopement. N.T., 3/10/21, at 181, 223. Mother testified that the relationship ended on October 11, 2015, when Murphy physically assaulted her. *Id.* at 226. As a result of the alleged incident, Murphy was charged with disorderly conduct, to which he pleaded guilty. *Id.* at 225-227; Plaintiff's Exhibit 7.

The romantic relationship between Appellee and Mother began in 2012. Their relationship was off and on until the date of their elopement. N.T., 6/11/20, at 10-11; N.T., 3/10/21, at 223, 227. According to Appellee, in August or September 2015, while dating Mother, he first learned of Murphy when Murphy contacted him and told him of his relationship with Mother. *Id.* at 16-17. Mother told Appellee that Murphy was "a crazy ex-boyfriend, don't listen to anything he has to say." *Id.* at 16.

In his August 2, 2019 petition for special relief, Appellee alleged that, since F.H.'s birth, Murphy had been in periodic contact with him and his family to tell them that he had an affair with Mother "and that the child was believed to be his." Petition for Special Relief, 8/2/19, at ¶ 6. Appellee alleged that "one of the sexual encounters" between Mother and Murphy was on December 10, 2015. *Id.* at ¶ 7. In addition, Appellee alleged that he conducted a private

paternity test on July 19, 2019, which revealed a 0.0000% probability that he is F.H.'s father. Moreover, Appellee alleged that Mother "lied to him in an attempt to trick him into thinking he was the child's father[.]" *Id.* at ¶ 15.[2] Appellee alleged that he "does have a relationship with the child already, but it is important that he find out if he really is his father." *Id.* at ¶ 15. Appellee asked the trial court to set aside the presumption of paternity and order paternity testing.

Mother filed a response and new matter on September 17, 2019, in which she denied ongoing sexual relations with Murphy. Rather, she alleged that, on one occasion, Murphy raped her, and that, prior to F.H.'s birth, Appellee was aware of the alleged rape. Nevertheless, Mother alleged that Appellee is F.H.'s father and she denied that she lied to Appellee or tricked him in matters concerning F.H.'s paternity. Further, Mother alleged that Appellee held F.H. out to be his son; therefore, he is estopped from denying paternity.

An evidentiary hearing on Appellee's petition commenced on June 11, 2020, when F.H. was four years old. By then, Murphy had obtained a private

---

[2] Appellee's petition for special relief has a total of 17 paragraphs, rather than 15 as indicated on the last page of the document. Paragraphs 1 through 14 are set forth in chronological fashion. The next paragraph is numbered "13," which is a typographical error. We identify the last three paragraphs of the petition as if they were properly numbered. Likewise, we identify the last paragraphs of Mother's response to the petition as if they were properly numbered.

paternity test, which revealed his paternity of F.H. Appellee, however, was paying child support pursuant to a final child support order issued on February 13, 2020. Defendant's Exhibit 11. In addition, Appellee introduced into evidence, and the court admitted, a child custody order which the parties consented to on June 10, 2020. The consent order awarded Mother sole physical and legal custody of F.H.; however, Mother was required to inform Appellee of any medical treatment of F.H. Defendant's Exhibit 23.

The hearing resumed on March 10, 2021, June 24, 2021, and August 12, 2021. During the four days of hearings, Appellee testified on his own behalf, and he presented the testimony of his mother, Sharon Cowen ("Cowen"), with whom the parties lived after their elopement in November 2015 until October of 2016. Appellee also presented the testimony of Murphy. Mother testified on her own behalf, and she presented the testimony of her father, Stephen Burns ("Burns").

In its opinion accompanying the subject order, the trial court set forth the relevant testimonial evidence, which our review of the record confirms. For purposes of this disposition, we adopt the court's recitation of the testimony. Trial Court Opinion, 10/8/21, at 2-15.

On October 18, 2021, after the parties filed closing argument briefs, the trial court issued the subject order and accompanying opinion. Because there was no intact marriage between Mother and Appellee, the court found the presumption of paternity inapplicable. Trial Court Opinion, 10/18/21, at 2.

The court then analyzed the doctrine of paternity by estoppel and found that Appellee proved that Mother fraudulently induced him into believing that he was F.H.'s biological father. In addition, the trial court found:

> F.H. has had no contact with [Appellee] for years. [F.H.] has had no physical contact since September 2019, and no Facetime video contact since April of 2020. At his young age, his memories of [Appellee] may not be strong. I find that it is in F.H.'s best interest to vacate the presumption of paternity, as this would have no adverse effect on the child.

*Id.* at 24. The court concluded that Appellee was not estopped from challenging paternity and ordered DNA testing to determine whether he is excluded as F.H.'s biological father. The court further ordered that, if the test results show Appellee is excluded as the biological father, then (1) paternity shall be vacated and (2) upon further proceedings, the court will consider whether to return "child support paid" to Appellee. Order, 10/18/21, at ¶ 2(b).

On November 15, 2021, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal. On the same date, Mother filed a motion to stay the subject order, which the trial court granted. In lieu of a Pa.R.A.P. 1925(a) opinion, the trial court referred this Court to its opinion accompanying the subject order.

On appeal, Mother presents the following issues for review, which we have re-ordered for ease of disposition:

1. Did the trial court err as a matter of law by holding that Appellee properly raised, and that Mother engaged in fraud relating to, the paternity of the child?

2.      Did the trial court err as a matter of law in its application of the doctrine of paternity by estoppel?

3.      Did the trial court err as a matter of law and abuse its discretion by finding that it was in the child's best interest to vacate the presumption of paternity and allow DNA testing without a fully developed record that explored the best interests of the child, including a determination and consideration of the bond between [Appellee] and child?

4.      Did the trial court have the authority to order DNA testing to determine the paternity of the child?

Mother's Brief at 5.

We review the trial court's order for an abuse of discretion. *Vargo v. Schwartz*, 940 A.2d 459, 462 (Pa. Super. 2007).

An abuse of discretion exists if the trial court has overridden or misapplied the law, or if there is insufficient evidence to sustain the order.  Moreover, resolution of factual issues is for the trial court, and a reviewing court will not disturb the trial court's findings if they are supported by competent evidence.  It is not enough [for reversal] that we, if sitting as a trial court, may have made a different finding.

*Id.* citing *Doran v. Doran*, 820 A.2d 1279, 1282 (Pa. Super. 2003) (internal citations omitted).  "The finder of fact is entitled to weigh the evidence presented and assess its credibility." *Vargo*, 940 A.2d at 462 quoting *Smith v. Smith*, 904 A.2d 15, 20 (Pa. Super. 2006).  In so doing, the finder of fact "is free to believe all, part, or none of the evidence and [we, as an appellate court,] will not disturb the credibility determinations of the [trial] court." *Vargo*, 940 A.2d at 462 (citation omitted).

The legal determination of the paternity of a child conceived or born during a marriage derives from the common law.

> [F]irst, one considers whether the presumption of paternity applies to [the] particular case. If it does, one then considers whether the presumption has been rebutted. Second, if the presumption has been rebutted or is inapplicable, one then questions whether estoppel applies. Estoppel may bar either a plaintiff from making the claim or a defendant from denying paternity.

*N.C. v. M.H.,* 923 A.2d 499, 502–503 (Pa. Super. 2007) quoting *Brinkley v. King*, 701 A.2d 176, 180 (Pa. 1997) (plurality opinion). Our Supreme Court has held, "before an order for a blood test is appropriate to determine paternity the actual relationship of the presumptive father and natural mother must be determined." *Jones*, 634 A.2d at 206 (citation omitted).

It is well-settled that the presumption of paternity is inapplicable when there is no longer an intact marriage to preserve. *Fish v. Behers*, 741 A.2d 721, 723 (Pa. 1999) (presumption of paternity only applies if its application would preserve an intact marriage or family; if no intact marriage or family exists, the presumption of paternity is inapplicable). In this case, Mother urges this Court to apply the presumption but does not claim error or abuse of discretion with the court's determination that the presumption does not apply. Indeed, Appellee and Mother were separated when Appellee filed the subject petition, and they were divorced by the time of the hearing. Given these circumstances, we agree that the presumption does not apply. Hence,

we concentrate our analysis on the trial court's conclusion that Appellee was not estopped from denying paternity of F.H.

In **Fish**, the Court explained:

> Estoppel in paternity actions is merely the legal determination that because of a person's conduct (e.g., holding out the child as his own, or supporting the child) that person, regardless of his true biological status, will not be permitted to deny parentage, nor will the child's mother who has participated in this conduct be permitted to sue a third party for support, claiming that the third party is the true father. As the Superior Court has observed, the doctrine of estoppel in paternity actions is aimed at "achieving fairness as between the parents by holding them, both mother and father, to their prior conduct regarding the paternity of the child."

**Fish**, 741 A.2d at 723 citing **Freedman v. McCandless**, 654 A.2d 529, 532–533 (Pa. 1995). The Court stated, "where the principle is operative, blood tests may be irrelevant, for the law will not permit a person in these situations to challenge the status which he or she has previously accepted." **Fish**, **supra** (citation omitted).

The doctrine of paternity by estoppel rests on the following public policy considerations:

> Estoppel is based on the public policy that children should be secure in knowing who their parents are. If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father.

**Fish**, 741 A.2d at 724 citing **Brinkley**, 701 A.2d at 180.

This Court has stated, however, that, "when allegations of fraud arise in a paternity action, an estoppel analysis must proceed in a different manner

than it would without such averments." ***Doran***, 820 A.2d at 1283 (citation omitted). We explained:

> The presumption that a child born during a marriage is a child of the marriage and the doctrine of paternity by estoppel grew out of a concern for the protection of the family unit; **where that unit no longer exists, it defies both logic and fairness to apply equitable principles to perpetuate a pretense**. In this case, application of estoppel would punish the party that sought to do what was righteous and reward the party that has perpetrated a fraud.

***Id.*** at 1283-1284 (emphasis added). This Court has reiterated, "[e]ven where the father-child relationship has been established, . . . evidence of fraud may preclude application of the doctrine of paternity by estoppel." ***Ellison v. Lopez***, 959 A.2d 395, 398 (Pa. Super. 2008). We have also stated, "where fraud or misrepresentation is involved, courts applying the doctrine of paternity by estoppel have taken care to consider evidence of the [putative father's] conduct toward the child not only *before* the husband learned that he was not the child's biological father, but also *after* becoming aware of his non-parentage." ***Vargo***, 940 A.2d at 464 (emphasis in original) (internal citations omitted).

To prove fraud in this case, Appellee was required to demonstrate by clear and convincing evidence "(1) a misrepresentation, (2) a fraudulent utterance, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as a proximate result." ***Ellison***, 959 A.2d at 398 (citation omitted).

In her first and second issues, Mother argues that the trial court erred as a matter of law by finding fraud and not applying paternity by estoppel. Mother baldly asserts that Appellee failed to specifically allege fraud in his petition; therefore, she asserts that Appellee waived his fraud claim. Mother's Brief at 32. In the alternative, Mother asserts that her conduct "does not meet the legal standard for fraud because she did not misrepresent the child's paternity to" Appellee. *Id.* at 33. Specifically, Mother argues that Appellee did not prove fraud or deception on her part because (1) Appellee was aware of the possibility that he was not F.H.'s biological father, and (2) Mother did not believe she was pregnant from her sexual encounter with Murphy on December 12, 2015. We disagree.

With respect to Mother's argument that Appellee failed to specifically allege fraud, we conclude that Mother waived this contention in failing to provide meaningful discussion with citation to relevant case authority in her brief. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-466 (Pa. Super. 2017) (citation omitted) (reiterating that a claim is waived where an appellate brief fails to provide any discussion of the claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review); Pa.R.A.P. 2119(a)–(b).

In addition, Mother did not file preliminary objections to Appellee's petition for special relief alleging insufficient specificity as to his allegations of fraud. *See* Pa.R.C.P. No. 1028(a)(3) (providing preliminary objections "may

be filed by any party to any pleading and are limited," in part, to "insufficient specificity in the pleading").  This Court has explained:

> [B]oilerplate allegations—without sufficient facts—constitute defective pleading.  Pa.R.C.P. 1019(a).  However, a party must file preliminary objections to preserve a claim that a pleading is insufficiently specific.  Pa.R.C.P. 1028(a)(3).  A party who fails to file preliminary objections waives any challenge to the specificity of that pleading.  Pa.R.C.P. 1032(a).

***Vill. of Four Seasons Ass'n, Inc. v. Elk Mountain Ski Resort, Inc.***, 103 A.3d 814, 821 (Pa. Super. 2014) (some citations omitted).  Thus, because Mother did not file preliminary objections to Appellee's petition, she has waived her challenge to any alleged lack of factual specificity.

Even if not waived, we would conclude that Mother is not entitled to relief on this basis.  This Court has reiterated:

> Averments of fraud are meaningless epithets unless sufficient facts are set forth which will permit an inference that the claim is not without foundation or offered simply to harass the opposing party and to delay the pleader's own obligations.  . . .  The pleadings must adequately explain the nature of the claim to the opposing party so as to permit him to prepare a defense and they must be sufficient to convince the court that the averments are not merely subterfuge.

***Presbyterian Med. Ctr. v. Budd***, 832 A.2d 1066, 1072–1073 (Pa. Super. 2003) citing ***Bata v. Central–Penn National Bank of Philadelphia***, 224 A.2d 174, 179 (Pa. 1966); Pa.R.C.P. 1019(b).

Our review confirms that Appellee's averments are not merely subterfuge.  Appellee sets forth facts sufficient to support a fraud claim and which afford Mother ample grounds upon which to prepare a defense.  Indeed,

Appellee averred that he questioned Mother on a number of occasions throughout their marriage about F.H.'s paternity, but Mother "has always insisted that the child was" his. Petition for Special Relief, 8/2/19, at ¶¶ 5-6. Further, Appellee averred that, at the first child-support conference in September 2018, "he was still thinking, mostly due to [Mother's] insistence, that he was the father of the child." *Id.* at ¶ 13. Lastly, Appellee averred that Mother "lied to him in an attempt to trick him into thinking he was the child's father[.]" *Id.* at 15. In her response and new matter, Mother denied that she lied to Appellee or tricked him about paternity. Response, 9/17/19, at ¶¶ 15-16. Thus, even if not waived, we would conclude that Mother has not demonstrated that Appellee's claims of fraud constituted mere subterfuge.

We now turn to Mother's argument, in the alternative, that the court erred in finding fraud. The trial court found that Appellee became aware on January 27, 2016, of the possibility "that he was not the biological father" of F.H. Trial Court Opinion 10/18/21, at 17. Appellee testified that, on January 27, 2016, his mother, Cowen, provided him and Mother with an audio recording of a telephone conversation between Mother and Murphy following a sexual encounter that occurred between them on December 12, 2015. N.T., 6/11/20, at 18-21; N.T., 3/10/21, at 13 (Cowen testified that the audio recording she received from Murphy included a discussion between Murphy and Mother in which they referred to the night they had intercourse and

Murphy told Mother she should leave Appellee and be with him). In addition, the trial court aptly found:

> [Appellee] may not have wanted to believe it, but he was aware of the possibility [that he was not F.H.'s father]. At the January 30, 2016 family meeting, Stephen Burns[, Mother's father,] suggested a paternity test could settle the issue. [Mother] did not want to undergo an in vitro test. After F.H. was born, [Appellee] chose not to have the child tested, regardless of whether the hospital offered a paternity test. [Appellee] could have taken F.H. (and himself) to be tested, or he could have ordered an at-home test as he did in 2019, to determine if he was the father. Instead, [Appellee] held himself out as F.H.'s father. He periodically questioned [Mother] about F.H.'s paternity, yet he continued to act as F.H.'s father.

Trial Court Opinion 10/18/21, at 17.

By way of background, there is no dispute that a family meeting occurred on January 30, 2016, between Appellee, Mother, Burns, Cowen, and Cowen's husband, for the purpose of discussing the extramarital sexual encounter that Appellee learned about on January 27, 2016. It was during this meeting that Mother informed Appellee and his family that her sexual encounter with Murphy on December 12, 2015, was due to rape.[3] Mother also

---

[3] Mother testified on direct examination that she reported the alleged rape to the East Pikeland Police Department on February 1, 2016. N.T., 6/24/21, at 62. Mother acknowledged that she hesitated to report it, in part, "[b]ecause I had worked with the police officers of . . . East Pikeland Police Department to stop [Murphy] from harassing me and seriously stalking me and they weren't doing an effective job, so I felt like part of it was they weren't going to assist me like they should. . . ." *Id.* at 62-63. Mother testified that she did not move forward with the rape allegation after reporting it in February 2016, "Because I was pregnant and I didn't want . . . Murphy knowing that I was pregnant. I just wanted him to leave me alone and just live my life with

*(Footnote Continued Next Page)*

informed Appellee and his family during the meeting that she purchased and ingested the Plan B oral contraceptive the morning after the alleged rape. N.T., 6/11/20, at 28. Appellee testified that Mother was "very adamant" during the family meeting "that the child was mine." *Id.* at 27. Appellee testified that he believed Mother's statements during the family meeting, and he did not demand that a paternity test be performed at that time because Mother stated she was opposed to "a needle [being stuck] in my stomach." *Id.* at 23. Further, Appellee testified that he signed the birth certificate when F.H. was born less than eight months later because "I still believed that [F.H.], at that point, was my son, and . . . I believed [Mother]." *Id.* at 36.

Likewise, there is no dispute that Appellee acted as F.H.'s father during the marriage and throughout the marital separations, which occurred from July 11, 2018, until March of 2019, and again from June 27, 2019, until their divorce in September 2019. Nevertheless, Appellee testified that he occasionally questioned Mother about his paternity. *Id.* He described Mother's response as "ruling with an iron fist. Our son is upstairs sleeping, how can you say something like that[?] He's your son. He's [sic] always been

---

my husband and honestly, I thought if I just let it go, . . . [Murphy] would go away[,] and that never happened." *Id.* at 63. Mother testified that the rape allegation "[is] currently being investigated" by the district attorney. *Id.* However, the record reveals that the East Pikeland Police Department closed its investigation of Mother's rape allegation on February 17, 2016. Exhibit P-9 at 28. Mother did not testify that the same police department re-opened its investigation or transferred the allegations to the district attorney's office.

your son. [Murphy] is not his father. He raped me. I got a Plan B. How could you even question something like that?" *Id.* at 36-37. On cross-examination, Appellee testified:

Q. Well, maybe you can explain what you mean by iron fist.

A. Basically, she was incredibly adamant. She was insistent and . . . persistent that I've been the father, I've always been the father, [Murphy] is not the father. How could you question that?

Q. Well, perhaps she believed that you were the father, correct?

A. She could think that, yes.

Q. And you had your doubts about that?

A. That's correct. But then [Mother] would go on one of those rants to, basically, shame me into even questioning something like that.

*Id.* at 143. Appellee reiterated on the last day of the subject proceeding that when he asked Mother if F.H. is "even mine[,] . . . she would . . . ridicule me into basically [implying] I was [a] bad person for considering that the baby upstairs may not be mine." N.T., 8/12/21, at 143.

Appellee testified that he seriously questioned his paternity because of Mother's conduct after their second separation, on June 27, 2019, due to Appellee's perception that Mother was trying to "ruin my life and take everything that she could." N.T., 6/11/20, at 52-53. Specifically, Mother filed

a Protection from Abuse ("PFA") petition against him,[4] and she filed a criminal complaint against him involving harassment. The allegations in both pleadings arose from the same set of facts that occurred on the date of their separation, the specifics of which are not in the certified record. *Id.* at 50. Appellee testified that he was "very concerned" about the criminal charge for the following reason:

> Because with the Air Force, I have a top[-]secret security clearance and to have something criminal on my record would not only potentially preclude me from getting a top security clearance — which just flying in my jet alone, you have to have a secret security clearance.
>
> We also carry guns in combat zones, and it's my understanding that something called the . . . Act precludes me from being able to carry a weapon in the military because of this [charge], which almost would certainly have gotten me kicked out of the Air Force because I wouldn't be able to do the job I was hired to do.

*Id.* at 51. Appellee testified that, following the PFA hearing, the court denied Mother's petition. *Id.* However, in a separate proceeding, Appellee was found guilty of the harassment charge, which he testified was a "summary offense."[5] *Id.*

---

[4] The record does not indicate whether Mother's PFA petition against Appellee was civil or criminal in nature. As best we can discern, neither the PFA petition nor the order denying it were introduced and admitted as exhibits during the hearing.

[5] There is no evidence in the record with respect to whether the conviction affected Appellee's Air Force career.

With this background in mind, Appellee explained his decision to perform a private paternity test "in the middle of" July 2019, as follows.

> [E]verything was getting so hectic [between Appellee and Mother,] and I wanted to believe [Mother], but with everything that was going on[,] in the back of my mind, I was kind of saying to myself, like, I've questioned [Mother] all along these past couple of years, and I've always been shut down, basically, with an iron fist that I am his father.
>
> And with everything that was going on, I just had to know whether or not [F.H.] was mine. And if he was, I was willing to fight for him. But if he wasn't then, you know, I didn't want to keep [Mother] in my life for the next 15 years to use [F.H.] against me . . . and potentially destroy everything.

*Id.* at 53-54.

In addition, Appellee decided to perform the private paternity test because Murphy once again contacted him around this same time. *Id.* at 53. The trial court found, and the record confirms, that Mother resumed contact with Murphy after the first and second marital separations. Trial Court Opinion, 10/18/21, at 19. Appellee introduced into evidence and the court admitted communications *via* Facebook messenger between Mother and Murphy in July 2018, at the time of the first separation. N.T., 6/11/20, at 193-199; Exhibit D-26. The trial court described one communication and weighed it as follows.

> If [Mother] was raped by [Murphy], why did she resume contact with him through messages after she broke up with [Appellee]? In one of their first messages, [Murphy] states[,] "I just want to know my son." [Mother] replies: **"I owe you a major apology for what had happened in the past which I regret and wanted to clear things up." (D-26)**. Why would [Mother] owe [Murphy] an apology if he had raped her?

Trial Court Opinion, 10/18/21, at 19 (emphasis added). The court found that Mother met Murphy at Wegmans grocery store "after the first break up and at a movie theater after the second breakup. Why would she go to Wegmans and to the movies with someone who raped her?" *Id.*; *see also* N.T., 6/11/20, at 193 and 206.

Murphy testified that he communicated with Mother for the purpose of obtaining a private paternity test. N.T., 6/11/20, at 205, 208. Murphy testified that Appellee ultimately made it possible for him to obtain a paternity test. *Id.* at 209. Indeed, Appellee testified that he paid for Murphy's paternity test, and, on September 2, 2019, he met Murphy with F.H. to obtain DNA samples. *Id.* at 58, 60-61. Appellee testified that Murphy's paternity test results were received approximately nine days later and revealed that Murphy "was without a doubt [F.H.]'s . . . biological father." *Id.* at 62.

The trial court determined that Appellee proved fraud by Mother. First, the court found incredible Mother's allegation that Murphy raped her. Trial Court Opinion, 10/18/21, at 18-20. The evidence supports the trial court's finding that the December 2015 sexual encounter between Mother and Murphy did not involve rape. The court based its finding on the audiotape of the telephone conversation between Mother and Murphy, which Appellee listened to on January 27, 2016. N.T., 8/12/21, at 138. In addition, Mother had multiple Facebook messenger communications with Murphy during her marital separations, and our review shows that she never accused him of rape in any

of them. Mother also physically met with Murphy while separated from Appellee. Finally, Murphy had not been charged with the crime of rape in the five and one-half years since Mother reported it to the police. *See* n. 3, *supra*.

Second, the trial court found that Mother made Appellee "feel ashamed for suggesting that F.H. could have been fathered by someone who had 'raped' her." Trial Court Opinion, 10/18/21, at 20. The court found that Appellee "continued to conduct himself as F.H.'s father because he believed [Mother]'s statements that he was the father[,] and that there was no possibility that the encounter with [Murphy] resulted in her pregnancy." *Id.* at 22. We discern no abuse of discretion.

Mother disputes the trial court's finding of fraud by alleging that she believed her sexual encounter with Murphy on December 12, 2015, did not result in her pregnancy with F.H. Therefore, Mother argues that Appellee did not prove the requisite intent of the fraud claim. Mother testified on direct examination:

> Q. Did you ever consider or entertain the thought that [Appellee] was not [F.H.]'s father?
>
> A. No, I never thought that.
>
> Q. How did you feel after you went to the OB/GYN on . . . January 4th of 2016, and you were told you were not pregnant?
>
> A. I was relieved.
>
> [Appellee's Counsel]: **Objection as to characterization,** because **you've always said that she understood she was not pregnant.**

**Q. Were you told?**

A. **I was not specifically told**. I was prescribed birth-control pills.

Q. Do you know why you were prescribed birth-control pills?

A. It was my understanding that I wasn't pregnant and that's why I was given them, to prevent pregnancy moving forward.

Q. And then on [January] 6th, you had the home [pregnancy] test with [Appellee] and found out you were, in fact, pregnant?

A. Yes.

N.T., 6/24/21, at 49-50 (emphasis added). Earlier that day on direct examination, Mother testified that she attended an OB/GYN appointment on January 4, 2016, "to get checked after I had been raped by Patrick Murphy." *Id.* at 5. Mother testified that, as a result of the appointment, she understood that she was not pregnant. *Id.* at 7.

The trial court did not believe that Mother attended an OB/GYN appointment on January 4, 2016. The court reasoned:

> [Mother] stated that she was asked if she was pregnant and she said she was unsure. N.T., 6/24/21, at 98. She stated[,] "they just handed me birth control pills so I assumed I wasn't pregnant. The doctors' office likes to give samples out of birth control pills." [*Id.*] at 98-99. She failed to provide any documentation of an appointment with any doctor on January 4, 2016. She testified that two days later, January 6, 2016, she told [Appellee] that she had not had her period and together they purchased two over-the-counter pregnancy tests. Why does she need to purchase tests from a drugstore if she was just examined by an OB/GYN two days earlier? The likely answer is that she never went to a doctor on January 4[.]

Trial Court Opinion, 10/18/21, at 19; *see also* N.T., 6/24/21, at 94 (Mother testified on cross-examination that she never told the physician she was raped during the January 4, 2016 appointment.). Mother's testimony supports the court's finding that she likely never went to the OB/GYN on January 4, 2016. It follows that Mother's testimony that she sincerely believed she was not pregnant on January 4, 2016, thereby eliminating the possibility in her mind that Murphy is F.H.'s biological father, is not credible.[6] *See Glover v. Severino*, 946 A.2d 710, 713 (Pa. Super. 2008) (reversing order denying appellant's request to challenge paternity due, in part, to conclusion that the trial court abused its discretion in finding that the mother's "persistent denials of any other possible father are made in 'good faith' is in conflict with our law of fraud in paternity actions, and contravenes common sense.").

Accordingly, we discern no abuse of discretion by the trial court in concluding that Mother perpetrated a fraud upon Appellee by (1) misrepresenting the nature of her December 12, 2015 extramarital sexual encounter with Murphy; (2) her adamant and persistent denial of the possibility that Murphy could be F.H.'s biological father and her simultaneous

---

[6] The trial court found that Mother's alleged January 4, 2016 appointment "is a falsehood that she told [Appellee] so that he would think she was not pregnant as of January 4, 2016." Trial Court Opinion, 10/18/21, at 19. This finding is not supported by the testimonial evidence. Indeed, Appellee testified that Mother neither told him that she went to the OB/GYN on January 4, 2016, nor that she understood from that appointment that she was not pregnant. N.T., 6/11/20, at 28-31, 165; N.T., 8/12/21, at 132, 134-135.

ridicule of Appellee when he questioned her about his paternity; (3) her intention to induce Appellee to assume parental responsibility for F.H.; (4) Appellee's justifiable reliance upon Mother's misrepresentation; and (5) Appellee's financial and emotional damage as a proximate result.

We reject Mother's reliance upon **Ellison v. Lopez**, **supra**, wherein this Court affirmed the trial court's order applying the doctrine of paternity by estoppel to the putative father. In that case, the trial court concluded that the putative father did not prove fraud.

In **Ellison**, the putative father was suspicious about his paternity from the time of the child's conception because he knew that the mother had sexual relations with another man during the relevant time. By the time the child was two years old, she did not physically resemble the putative father. However, the putative father waited an additional two years to obtain a paternity test and challenge his paternity. The putative father testified that he waited the additional two years because "I was kind of fearful of the results and possibly having [the child] taken away from me, not being able to be involved with her. That's kind of what kept me prolonging to do the test, was the fear of actually finding out that she wasn't mine." **Ellison**, 959 A.2d at 397 (citation to record omitted). As such, this Court concluded that the evidence confirmed that the putative father did not prove fraud insomuch as he was not misled by the mother; rather, "he made a decision to be in the child's life even though he questioned his paternity[.]" **Id.** at 398.

*Ellison* is distinguishable from the instant matter. As discussed above, Appellee's acceptance of F.H. as his son was based on Mother's adamant and persistent refusal to acknowledge that Murphy could be the child's biological father and her ridicule of Appellee in questioning whether F.H. was conceived by rape. Therefore, Appellee was misled by Mother, and *Ellison* is not controlling.

We next consider Appellee's conduct toward F.H. after becoming aware that F.H. is not his son. As discussed above, Appellee performed a private paternity test in the middle of July 2019, which revealed that he is not F.H.'s biological father. N.T., 6/11/20, at 54. On August 2, 2019, Appellee filed the subject petition for special relief. In addition, on August 2, 2019, Appellee attended a child support conference, which resulted in an *interim* order, and the parties agreed to a child support order in February 2020. *Id.* at 126-127. Appellee testified that he agreed to the child support obligation rendered against him and did not challenge paternity during the support conference "[b]ecause it . . . wouldn't have made a difference at that point." *Id.* at 56. On direct examination, he explained:

Q. Why do you say that?

A. Because that is not the proper route to go to challenge paternity in court.

*Id.* Rather, Appellee testified that his petition for special relief was the proper way to challenge paternity, which he filed the same day. *Id.*

- 24 -

Appellee's last custodial visit with F.H. occurred on September 2, 2019, the day he met Murphy to collect the DNA samples for Murphy's private paternity test. N.T., 6/11/20, at 66. There is no dispute that Appellee has not physically seen F.H. since that date, which was nearly two years by the conclusion of the subject proceeding. Appellee testified that he videotaped the collection of the DNA samples on September 2, 2019, and his counsel provided the videotape to Mother's counsel on September 10, 2019. *Id.* On September 17, 2019, Mother filed an emergency petition for special relief on the custody docket in which she alleged that Appellee placed F.H. in danger by exposing him to Murphy at the time the DNA samples were collected. Mother requested that Appellee's custodial time "be suspended" or, in the alternative, "limited to supervised visitation." Emergency Petition, 9/17/19, at ¶ 25. In addition, Mother requested sole legal custody. Appellee testified that the court denied Mother's emergency petition, but she did not abide by the existing custody order. *Id.* at 75. Appellee did not file a petition for contempt of the existing custody order against Mother. *Id.* Finally, by agreed-upon order dated June 10, 2020, Mother was awarded sole legal and physical custody of F.H.

It is undisputed that Appellee participated in FaceTime telephone calls with F.H. until April 2020. However, Appellee testified that Mother infrequently answered his telephone calls to F.H. N.T., 6/11/20, at 76-80. Appellee introduced into evidence, and the court admitted, his FaceTime

telephone history. Exhibits D–16-20. Appellee testified that, since F.H.'s birthday in September 2019, until Appellee stopped calling in April 2020, Mother failed to answer Appellee's telephone calls 189 times. N.T., 6/11/20, at 80.

Based on the evidence of Appellee having no in-person contact with F.H. soon after becoming aware that he was not his biological father, and having FaceTime phone calls for approximately seven months after his last in-person contact with F.H., we conclude that the trial court did not abuse its discretion in determining that Appellee is not estopped from challenging paternity. **See Vargo**, 940 A.2d at 464 ("[W]here fraud or misrepresentation is involved, courts applying the doctrine of paternity by estoppel have taken care to consider evidence of the [putative father's] conduct toward the child not only *before* the husband learned that he was not the child's biological father, but also *after* becoming aware of his non-parentage.") (emphasis in original) (internal citations omitted). Mother's first and second issues on appeal fail.

In her third issue, Mother argues that the court abused its discretion in granting Appellee's petition for special relief "without a fully developed record that explored the best interests of the child, including a determination and consideration of the bond between" Appellee and F.H. Mother's Brief at 40. Mother relies upon **K.E.M. v. P.C.S.**, 38 A.3d 798 (Pa. 2012). We are unpersuaded by Mother's argument.

We disagree that the record was insufficient for the trial court to conclude that the subject order would not adversely affect F.H. As set forth above, the record evidence demonstrates that (1) Appellee challenged his paternity in court on August 2, 2019, approximately two weeks after learning the results of his private paternity test; (2) Appellee has not been in F.H.'s physical presence since September 2, 2019, the day that Murphy performed his private paternity test, when F.H. was nearly three years old; and (3) Appellee has not spoken to F.H. since April 2020, when F.H. was three and one-half years old. By the time the hearing concluded, F.H. was nearly five years old. Thus, we discern no abuse of discretion by the court in concluding that F.H. would not be adversely affected by the order.

Even if the record were not fully developed regarding F.H.'s best interests, we would conclude that **K.E.M.** is not controlling because that case did not involve fraud. The mother in that case initiated a child support action against her boyfriend, whom she believed was the child's biological father. The child was born during the mother's marriage to her husband. After the mother confessed her extramarital affair, her husband performed a private paternity test which excluded him as the child's father. The mother's boyfriend refused to perform a private paternity test, and he filed a motion to dismiss the child support action.

By the time of the hearing on the motion to dismiss, the mother was separated from her husband, but neither had commenced divorce

proceedings. The trial court granted the motion to dismiss after concluding that the presumption of paternity controlled "and, alternatively, that [the mother's husband] should be regarded as [the child]'s father via paternity by estoppel." **K.E.M.**, 38 A.3d at 800 (citation omitted).

On appeal, this Court disagreed that the presumption of paternity controlled since it would not protect the mother's marriage "'from the effects of disputed paternity.'" **Id.** at 802 (citation omitted). The panel, however, affirmed the trial court's order after concluding the doctrine of paternity by estoppel applied because the mother's husband held the child out as his own for the first four years of the child's life.

Our Supreme Court reversed. The Court concluded that the record was "very sparse" with respect to the child's relationship with the mother's husband and what harm, if any, "would befall" the child if her husband's "parental status were to be disestablished." **Id.** at 809. Therefore, the Court remanded the case to the trial court for an additional hearing regarding the child's best interests.

In reversing and remanding the matter, our Supreme Court considered the continuing application of paternity by estoppel due to the availability of private genetic testing which may make biological paternity known outside the scope of judicial proceedings. The Court recognized that case law has relegated the presumption of paternity "to a substantially more limited role, by narrowing its application to situations in which the underlying policies will

be advanced (centrally, where there is an intact marriage to be protected)."

*Id.* at 807 (citation omitted). The Court continued, "this does increase the relative importance of paternity by estoppel in the support arena." *Id.* The Court then reasoned:

> The positions of Justices and judges favoring an enhanced role for genetic testing may have more limited relevance in the paternity by estoppel setting (as contrasted with the presumption of paternity). In the estoppel cases, a legal determination is being made that it is in the best interests of the child to continue to recognize the husband as the father.

*Id.* (citation omitted). As such, our Supreme Court concluded that "there remains a role for paternity by estoppel in the Pennsylvania common law, in the absence of definitive legislative involvement." *Id.* (footnote omitted). That role, articulated by the Court, is the doctrine's application "only where it can be shown, on a developed record, that it is in the best interests of the involved child." *Id.* at 810.

The Court explained, "**[a]bsent any overriding equities in favor of the putative father, such as fraud,** the law cannot permit a party to renounce even an assumed duty of parentage when by doing so, the innocent child would be victimized. . . ." *Id.* at 807 quoting ***Commonwealth ex rel. Gonzalez v. Andreas***, 369 A.2d 416, 419 (Pa. Super. 1976) (emphasis added).

In contrast to ***K.E.M.***, Appellee in this case raised and proved a claim of fraud. Thus, ***K.E.M.*** is distinguishable. As stated above, it is well-settled that, "[e]ven where the father-child relationship has been established, . . . evidence

of fraud may preclude application of the doctrine of paternity by estoppel."
***Ellison***, 959 A.2d at 398.

In this case, we have determined that the record supports the trial court's finding that Mother perpetrated a fraud on Appellee, and that Appellee's conduct toward F.H. changed after learning that he was not the child's father. Based on this evidence, we discern no abuse of discretion by the court in concluding that Mother is precluded from applying the doctrine of paternity by estoppel. Indeed, if the court estopped Appellee from challenging paternity, it would have punished him who had "sought to do what was righteous" by assuming parental duty of F.H., and it would have rewarded Mother who "perpetrated a fraud." ***Doran***, 820 A.2d at 1283-1284. Mother's third issue fails.

In her fourth and final issue, Mother argues that the trial court did not have authority under 23 Pa.C.S. § 5104 (blood tests to determine paternity) to order DNA testing because paternity had already been established "as a matter of law by the entry of each support order" agreed to by Appellee.[7]

---

[7] Section 5104 provides, in pertinent part,

> **(c) Authority for test.** — In any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to

*(Footnote Continued Next Page)*

Mother's Brief at 43. Mother relies upon ***Barr v. Bartolo***, 927 A.2d 635 (Pa. Super. 2007), which reversed the order granting the petition of the mother for DNA testing of the child's putative father. We reiterated, "the failure to appeal a support order conclusively establishes paternity." ***Id.*** at 639 (citations omitted).

***Barr*** is distinguishable. Indeed, in that case we expressly stated, "absent appeal **or showing of fraud** in support order, issue of paternity is established as a matter of law." ***Barr***, 927 A.2d at 642 citing ***Sanders v. Sanders***, 558 A.2d 556 (Pa. Super. 1989) (emphasis added).

In ***Barr***, the putative father claimed on appeal that the paternity of the mother's husband had been established as a matter of law by the child support orders entered against him, from which he did not appeal, and this barred relitigation of the paternity issue. This Court agreed and held, "[r]elitigation of the paternity issue is barred under the doctrine of collateral estoppel." ***Barr***, 927 A.2d at 641. We stated, however, that the record did not support the existence of fraud. ***Id.*** at 643. On this basis, we held the mother was collaterally estopped from denying her husband's paternity, and the trial court

---

submit to the tests, the court may resolve the question of paternity, parentage or identity of a child against the party or enforce its order if the rights of others and the interests of justice so require.

23 Pa.C.S. § 5104(c).

erred in ordering the putative father to undergo genetic testing. Because we have determined that the record in this case supports the existence of fraud by Mother, **Barr** is not controlling. Therefore, the trial court had authority under 23 Pa.C.S. § 5104(c) to issue the subject order. Mother's final issue fails. Accordingly, we affirm the order.

Order affirmed.


*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


Date: *9/8/2022*